[No. 27333. Department Two. March 31, 1939.]

FISHERMEN'S COOPERATIVE ASSOCIATION, *Respondent*,
v. THE STATE OF WASHINGTON *et al.*, *Appellants.*[1]

[1]Reported in 88 P. (2d) 593.

*The Attorney General* and *R. G. Sharpe, Assistant,* for appellants.

*Caldwell, Lycette & Diamond,* for respondent.

MILLARD, J.—Under the revenue act of 1935, as amended, reading as follows, the state tax commission, on the theory that the Fishermen's Cooperative Association was engaged within this state in the business of making sales at wholesale, exacted from the association for the period May 1, 1935, to August 31, 1937, an occupation tax amounting to $2,843.10:

"From and after the first day of May, 1935, there is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows:

"(a) Upon every person engaging within this state in business as an extractor; . . . .

"(b) . . . . as a manufacturer; . . . .

"(c) . . . . of making sales at retail; . . . .

"(d) Upon every person engaging within this state in the business of making *sales at wholesale;* as to such persons the amount of *tax* with respect to such business shall be *equal to the gross proceeds of sales of such business* multiplied by the rate of one-quarter of one per cent; . . . .

"(e) . . . . of printing and of publishing newspapers, periodicals or magazines; . . . .

"(f) Upon every person engaging within this state in any business activity other than or in addition to those enumerated in subsections (a), (b), (c), (d) and (e) above; as to such persons the amount of tax on

account of such activities shall be equal to the gross income of the business multiplied by the rate of one half of one per cent. This subsection includes, among others, and without limiting the scope hereof, persons engaged in the following businesses (whether or not title to materials used in the performance of such businesses passes to another by accession, confusion or other than by outright sale): Repairing, personal, business, professional, mechanical and educational service businesses, abstract and title insurance, financial, brokerage, construction contracting and sub-contracting, advertising and hotel businesses." Rem. Rev. Stat. (Sup.), § 8370-4 [P. C. § 7030-64]; Laws of 1935, chapter 180, § 4, p. 709; Laws of 1937, chapter 227, § 1, p. 1138. (Italics ours.)

Terms are defined by the statute as follows:

" . . . . (b) The word 'person' or word 'company', herein used interchangeably, means any individual . . . . or any group of individuals acting as a unit, whether mutual, cooperative, fraternal, non-profit or otherwise;

"(c) The word 'sale' means any transfer of the ownership of, or title to, property for a valuable consideration. . . .

"(d) The term 'sale at retail' or 'retail sale' means every sale of tangible personal property other than a sale to one who purchases for the purpose of resale in the regular course of business or for the purpose of consuming the property purchased in the producing for sale a new article or substance, of which such property is an ingredient or component or a chemical used in processing same. . . . .

"(e) The term *'sale at wholesale'* or *'wholesale sale' means any sale* of tangible personal property *which is not a sale at retail;*

"(f) The term *'gross proceeds of sales' means the value proceeding or accruing from the sale* of tangible personal property *without any deduction on account of* the cost of property sold, the cost of materials used, labor cost, interest, discount paid, delivery *costs,* taxes, *or any other expense* whatsoever paid or accrued and without any deduction on account of losses;

"(g) The term 'gross income of the business' means the value proceeding or accruing by reason of the transaction of the business engaged in and includes gross proceeds of sales, compensation for the rendition of services, gains realized from trading in stocks, bonds or other evidences of indebtedness, interest, discount, rents, royalties, fees, commissions, dividends, and other emoluments however designated, all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes or any other expense whatsoever paid or accrued and without any deduction on account of losses; . . . ." Rem. Rev. Stat. (Sup.), § 8370-5 [P. C. § 7030-65]; Laws of 1935, chapter 180, § 5, p. 711; Laws of 1937, chapter 227, § 2, p. 1140. (Italics ours.)

Pursuant to the statutory provision (Laws of 1935, chapter 180, § 199, p. 837, Rem. Rev. Stat. (Sup.), § 8370-199 [P. C. § 7030-259]) therefor, the Fishermen's Cooperative Association appealed to the superior court for Thurston county from order of the state tax commission denying petition for refund to the association of $2,843.10 tax exacted from it as recited above.

In that "Notice of Appeal," which constitutes a complaint, plaintiff, a domestic non-profit cooperative corporation, alleged that the state, by and through its tax commissioners, exacted from it an occupation tax, in the amount and for the period above stated, as a tax upon sales, allegedly made at wholesale, of troll-caught salmon—the property of plaintiff's individual fishermen members—taken from waters outside the territorial limits of the state of Washington; that a substantial portion of such salmon was sold in the state of New York (constituting transactions in interstate commerce, hence not subject to state taxation), and the remainder was sold to Washington wholesalers, who paid such wholesaler's tax upon portion

they purchased when sold by them within the state of Washington. Plaintiff further alleged that, in making such sales, it was engaged exclusively as a broker or agent in promoting sales for its individual fishermen members, and that the taxes paid were illegally exacted.

The trial court expressed the view that the tax was imposed upon the gross proceeds of sales and not upon the gross income of plaintiff, which was acting merely as sales agent for its individual fishermen members engaged in trolling for and catching salmon outside the three-mile limit of the state; and that, so far as the plaintiff (between whom and the fishermen there was no sale) was concerned, there was no wholesale sale of the fish, hence the tax was unlawfully imposed. Judgment, in accordance with prayer of the complaint, was entered in favor of plaintiff for a refund of the tax paid, and further enforcement of the law as to plaintiff was enjoined. Defendants appealed.

Appellants contend that, under Laws of 1935, chapter 180, § 10, p. 716 (Rem. Rev. Stat. (Sup.), § 8370-10 [P. C. § 7030-70]), of which they quote the first paragraph, a factor with power to sell is deemed the seller. The whole section reads as follows:

"SEC. 10. Every consignee, bailee, factor or auctioneer having either actual or constructive possession of tangible personal property, or having possession of the documents of title thereto, with power to sell such tangible personal property in his or its own name and actually so selling, shall be deemed the seller of such tangible personal property within the meaning of this title; and further, the consignor, bailor, principal or owner shall be deemed a seller of such property to the consignee, bailee, factor or auctioneer.

"The burden shall be upon the taxpayer in every case to establish the fact that such taxpayer is not engaged in the business of selling tangible personal

property but is acting merely as broker or agent in promoting sales for a principal; such claim will be allowed only when the taxpayer's accounting records are kept in such manner as the tax commission shall by general regulation provide."

It is further argued that, in view of our holding in *Yakima Fruit Growers Ass'n v. Henneford,* 187 Wash. 252, 60 P. (2d) 62, non-profit cooperative corporations like respondent are included in the class subject to the business tax imposed by Laws of 1935, chapter 180, p. 706. In the case cited, we said:

"Manifestly, it was the intention of the legislature not to exempt from the operation of the statute the activities of a corporation, cooperative or otherwise, simply because its members are stockholders and so manage its affairs that it was not permitted as a corporation to profit from its activities. Plainly, the respondents conduct their activities with the object of gain, benefit or advantage to their members or stockholders. The very purpose of the legislature, read in the light of the trial court's judgment in *Yakima Fruit Growers Ass'n v. Henneford,* 182 Wash. 437, 47 P. (2d) 831, is obvious. The legislature intended, and so said, to amend the section to make it applicable to so-called non-profit cooperative associations and companies."

It is appellants' position that the business activities represented by sales made by respondent or made by respondent's selling agent (Oxenberg Brothers) were wholesale sales and were, therefore, subject to the business tax, unless the sales were exempt either by reason of the character and origin of the fish or by reason of the destination of the shipment resulting from the sales.

Respondent sought refund of the tax on three grounds:

(1) It was not engaged in business as a wholesaler and was not subject to a tax measured by the selling price of certain fish sold by its members.

(2) Sales of fish taken from waters outside of the territorial limits of the state of Washington constitute imports and are not taxable under the laws of this state.

(3) A substantial portion of the sales of fish was made to buyers outside the state of Washington, constituting transactions in interstate commerce and not subject to state taxation, and the remainder of the fish was sold to wholesalers in this state, who paid the wholesaler's tax upon the salmon when sold at wholesale by them in this state.

The question presented is whether the Fishermen's Cooperative Association, a domestic non-profit, cooperative corporation, which was organized for the purpose of (and is engaged exclusively therein) promoting sales for its individual fishermen members, is subject to be taxed as a wholesaler under the business and occupation tax act (Laws of 1935, chapter 180; Laws of 1937, chapter 227; Rem. Rev. Stat. (Sup.), §§ 8370-4, 8370-5) measured by the selling price of the fish taken by the association's individual fishermen members from waters outside the territorial limits of the state of Washington and sold for those fishermen by the association.

Respondent was organized in April, 1935, as a domestic non-profit, cooperative corporation by troll salmon fishermen to promote, foster, and encourage the fishing industry on the Pacific coast. It was authorized under its charter to engage in any activity in connection with the production, preservation, packing, processing, shipping, warehousing, handling, and marketing of all kinds of fish and in the financing of any such operations. Respondent was also authorized by its charter to act as agent, representative, factor or broker of any person, firm, or corporation in any of its activities. Respondent, which represents ninety-

eight per cent of the trollers of this state, has a president and secretary, who serve without salary. The seven trustees of the corporation receive five dollars a day and expenses while in session about two months of each year. Of the three hundred and seventy-five members (all of whom are fishermen) of the association, three hundred and thirty-five own trolling boats which are employed in catching fish (almost all of which are salmon) with hook and line beyond the three-mile limit. In some cases, two or more members own a single boat as partners. Only four of the members are not boat owners.

When respondent association was organized, it engaged Oxenberg Brothers (a copartnership consisting of William and Sam Oxenberg) as its exclusive sales agent under an oral agreement, which was reduced to writing March 12, 1936. That sales agency agreement terminated March 12, 1937. The principal activities of that partnership agency are in Brooklyn, New York, where the partnership was engaged in the business of curing and preserving fish and distributing the same to dealers. The partners maintained a receiving station, consisting of a fish house, office quarters, and storage space, at Bell street dock, in Seattle. They rented cold storage facilities from the port of Seattle as needed, and also maintained receiving stations on a barge at Neah Bay, Washington, and at the dock at Westport, Washington.

The contract between respondent cooperative association and its selling agent, Oxenberg Brothers, reads, in part, as follows:

"Whereas, the Cooperative is a cooperative corporation organized by fishermen engaged in commercial fishing, for the cooperative marketing and sale of all fish caught by its members and all other fishermen affiliated with or controlled by said Cooperative; and

"Whereas, the Selling Agent is engaged in the busi-

ness of buying and selling fish and fish products on a large scale, and is familiar with the market for said fish and fish products, and skilled and experienced in marketing the same, and able to make the necessary advancements to said Cooperative and its members and all fishermen otherwise affiliated with or controlled by said Cooperative, upon all fish caught by them prior to the sale thereof;

"Now, therefore, it is hereby mutually agreed by and between the parties hereto as follows:

"(1) That the Cooperative does hereby, for the term of one year from the date hereof, designate and appoint the Selling Agent as its sole and exclusive selling agent for the handling, storing and selling of all fish caught by said Cooperative, its members and all other fishermen affiliated with or controlled by said Cooperative and coming into the possession of said Cooperative under the terms of the marketing agreements entered into between said Cooperative and its members."

Under that agreement, all fish caught by respondent's members were delivered directly to the selling agent at the receiving stations at Neah Bay, or at Westport, or at Seattle. The selling agent made advances directly to the fishermen upon their catches according to the advance prices fixed in the sales agency agreement. The fish received by the selling agent at Neah Bay or Westport were transported to Seattle. The fish were then sold by Oxenberg Brothers for the best prices obtainable either as fresh fish or as mild-cure fish.

All of the costs and expenses of handling, transportation, and negotiation of sales of the fish, including mild-curing, were charged to the individual fisherman by Oxenberg Brothers. Mild-curing is the process of removing the head and backbone and splitting the fish down the center. The fish is then placed in a barrel or tierce with salt. Mild-curing preserves the fish while being transported and sold. Mild-cured fish are

not a finished product; smoking or other processing of the fish is required before they can be used.

After selling the fish and deducting their commission, the expenses of handling and selling and mild-curing and charging the costs of transportation of the fish from Westport or Neah Bay to the particular lots of fish and fishermen whose fish were so transported, Oxenberg Brothers deducted and paid to the respondent 1/6¢ per pound on the fish sold to cover respondent's office expense and cost of supervising of sales made, and also paid to the respondent ⅓¢ per pound on fish sold, for which respondent issued capital stock of respondent corporation to its fishermen members. Any balance that remained was then paid to the fishermen directly by Oxenberg Brothers in proportion to the quantity and quality of fish that each fisherman had delivered to Oxenberg Brothers.

After March 12, 1937, the sales agency agreement terminated. Thereupon, respondent purchased and maintained a barge at Neah Bay, took over the receiving station at Westport, and chartered a boat to transport the fish from the barge at Neah Bay to Seattle. The fish were transported from Westport by motor freight to Seattle. At its Seattle office, the respondent set up an exchange board, over which sales of the fish were made. The fish were handled about the same as under the agreement between respondent and Oxenberg Brothers. Some of respondent's members delivered their fish to the receiving stations at Neah Bay or at Westport, and others brought their fish directly into Seattle. No advances were made.

When the fish were brought to Seattle, they were left either on the fisherman's boat, the tender, or the truck, and were listed on the exchange board by the respondent for the fishermen under the name of the fisherman's boat or under the name of the tender or

truck. Each morning at nine o'clock, the fish were sold, if the sale was approved by the fisherman, to the highest bidder of the eleven bidding fish dealers who bid each morning. The fish were then delivered by the fisherman or the carrier, without previous unloading, to the buyer, who then weighed and graded the fish and issued his check in payment, which check was payable and delivered to the fisherman except in the case of the fish pooled and brought in from Neah Bay or Westport by carrier. In the second case, the check was made payable to the respondent for that particular tender or truck which transported the fish.

The fisherman member would indorse his check to the respondent and receive in return a check from the respondent after deduction of $1/6$¢ per pound for office and supervisory expense and $\frac{1}{3}$¢ per pound for stock certificates of respondent corporation issued to the fishermen of the corporation, and, possibly, a further deduction for any indebtedness of the fisherman to the respondent for supplies which the fisherman may have charged at one of the commissaries maintained by the respondent at Neah Bay or Westport. Respondent deducted an additional $1\frac{1}{4}$¢ per pound on the fish brought from Neah Bay, and $1\frac{1}{2}$¢ per pound on the fish brought from Westport to cover the cost of transporting the fish from those points to Seattle. All the fish were taken from waters outside the jurisdictional boundaries of the state of Washington.

The total income to respondent (other than from capital stock sales) for the years 1935, 1936, and 1937, approximated twenty-one thousand dollars. In addition, in 1937, respondent received $21,977.89 to cover the cost of transporting the fish from Neah Bay and $15,721.36 to cover the cost of delivering the fish from Westport. Respondent, which is licensed by the state

as a broker, was taxed on the basis of ¼ of 1% of the total selling price of the fish sold by its members, being ¼ of 1% of $1,137,242.07, or a tax of $2,843.10.

Counsel for respondent concede that the business and occupation tax act includes cooperatives, therefore respondent comes under the act. It is insisted, however, that respondent is not engaged in business as a wholesaler under the act and is not taxable at any rate based upon the total selling price of the fish belonging to its members; that is, the tax should be measured, if at all, by the gross income of the business—gross income to the respondent—and should not be measured by the gross proceeds of sales of fish made by the members of respondent association.

We are clear that, under *Yakima Fruit Growers Ass'n v. Henneford,* 187 Wash. 252, 60 P. (2d) 62, the activities of respondent cooperative corporation are not exempt from the operation of the tax act. While the members of the respondent association are its stockholders, and respondent as a corporation may not profit from its activities, it is plain that the association or corporation is the vehicle with, or the channel through, which the members who are the stockholders conduct their activities cooperatively with the object of gain, benefit, or advantage to the association's members or stockholders of the corporation. Under subd. (d), Rem. Rev. Stat. (Sup.), § 8370-4, and subd. (e) and (f), Rem. Rev. Stat. (Sup.), § 8370-5, respondent is subject to occupation or business tax at the rate of one-fourth of one per cent of the gross proceeds of sales of fish within this state by respondent's members, through respondent.

While we agree with counsel for respondent that the first paragraph of § 10, chapter 180, Laws of 1935, p. 716, Rem. Rev. Stat. (Sup.), § 8370-10, quoted by counsel for appellants, to the effect that respondent

was at least the auctioneer and at the time of sale was in possession of the fish with full power of sale, hence will be deemed to be the seller, does not conclude respondent, it is clear from the second paragraph of that section—the whole section is quoted above—that the burden is upon the taxpayer to establish the fact that it is acting merely as a broker or agent in promoting sales for a principal and is not engaged in making sales at wholesale. That section does not require payment of a tax based on the selling price if, in fact, the taxpayer is acting merely as a broker or agent in promoting sales for others.

The statute provides that the word "sale" means any transfer of the ownership of property for a valuable consideration, and that "sale at wholesale" means any sale of tangible personal property which is not a sale at retail.

Concededly, the sales made were not retail sales; that being so, if respondent was not acting as a broker or agent in promoting sales for others, the sales were sales at wholesale. In view of the 1935 amendment of the 1933 occupation tax act as construed by us in *Yakima Fruit Growers Ass'n v. Henneford,* 187 Wash. 252, 60 P. (2d) 62, the sales by the members of respondent association through the association constituted wholesale sales by respondent cooperative association.

 Counsel for respondent contend, and cite *Booth Fisheries Corp. v. Case,* 182 Wash. 392, 47 P. (2d) 834, as sustaining authority, that, as nearly all of the fish were taken from waters outside the territorial jurisdiction of the state of Washington, those fish were imports, hence not subject to state taxation under Art. 1, § 10 of the United States constitution, reading as follows, forbidding taxation by the state of imports or exports without the consent of the Congress:

"No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; . . ."

In holding that a "catch tax" on fish taken from waters of the Pacific ocean outside the territorial limits of this state was not collectible because the state has no power to levy an impost on imports, we said in *Booth Fisheries Corp. v. Case, supra:*

"That fish caught in the Pacific ocean beyond the territorial limits of the state are imports, when brought into the state, is not open to question. *Gulf Fisheries Co. v. Darrouzet,* 17 Fed. (2d) 374. See, also, *Gulf Fisheries Co. v. MacInerney,* 276 U. S. 124, 48 S. Ct. 227. So long as the imported article does not become commingled with the mass of property in the state, it is exempt from taxation by the state. *Brown v. Maryland,* 25 U. S. 266. It loses this exemption only when sold, or when it is taken from the original package and exposed for sale, *Sonneborn Bros. v. Cureton,* 262 U. S. 506, 43 S. Ct. 643.

"Respondent contends, however, that the tax contemplated by the portion of § 1 which we have quoted is an occupation tax, and not a levy upon imports. Taken alone, the language quoted might be susceptible of such construction. But to so construe it would necessitate reading § 2 out of the act. That section, it is to be remembered, defines the imposition as a 'catch tax' and purports to levy it on fish caught in the Pacific ocean beyond the territorial limits of the state. This, under the authorities cited, the state has not the power to do. Respondent, recognizing this, invited us to ignore § 2 entirely. If this be done, he urges that the quoted portion of § 1 could and should be construed as an occupation tax upon such dealers in salmon as the plaintiffs."

The fishermen, at the time the fish were caught beyond the territorial jurisdiction of this state, washed and cleaned (gills and intestines removed) and iced (stuffed crushed ice inside stomach and head) the fish.

When delivered to Neah Bay or Westport, the ice was removed from the fish and the fish were weighed and graded so that each fisherman could be notified of the number of pounds of each grade for which he was entitled to payment and which should be re-iced. *Neah Bay and Westport are within the state of Washington.* The fish were then placed in boxes and transported to Seattle. While being transported, the fish were merely protected with ice. When the fish arrived at Seattle, they were re-iced and the heads removed from a large proportion of the fish.

About forty per cent of all the fish handled by Oxenberg Brothers was mild-cured at its Seattle plant at respondent's expense. This process involved the removing of the head and part of the bones, splitting of the fish down the center, and placing the fish in a tierce or barrel with salt. After the expiration of the contract of Oxenberg Brothers with respondent, none of the fish was either beheaded or mild-cured. The fish were all sold as taken from the water, except for icing and cleaning, which was first done on the high seas by the fishermen. When the fish arrived at Neah Bay and Westport, they were re-iced and weighed and graded.

Clearly, as to all of the fish except those sold to buyers outside the state of Washington (which sales constituted transactions in interstate commerce), such fish lost their distinctive character as imports and became taxable by the state. *Gulf Fisheries Co. v. MacInerney,* 276 U. S. 124, 72 L. Ed. 495, 48 S. Ct. 227, is a controlling authority. In holding that a state license tax upon dealing in fish, regulated according to the weights sold, was not unconstitutional as applied to imported fish which, when the tax attached, had lost their distinctive character as imports and had become, through processing, handling, and sale, a part

of the common property of the state, the United States supreme court said in the case cited:

"We have no occasion to enquire whether the fish are imports. Nor need we enquire whether the statute could be sustained as an inspection law. On the facts agreed, the tax is not laid until the fish have lost their alleged distinctive character as imports and have become, through processing, handling and sale, a part of the mass of property subject to taxation by the State. The facts are these:

"The fish are caught in the Gulf of Mexico and are landed, in bulk, by the fishing boats on the wharf of the Galveston Wharf Company. That is the Gulf Fisheries Company's only place of business. And there it has the privileges required for the conduct of its business. It has space for unloading the fish; has several large bins or ice-boxes for storage, handling and re-icing; has space for loading fish on express cars; and has space for the office work incident to the loading, selling and shipping. After the fish are unloaded from the vessels, all are weighed and washed. All are immediately re-iced to prevent spoiling. About 75 per cent. are there beheaded and gutted; 7 to 10 per cent. are gutted and gilled with heads on; the remainder are left for sale without beheading or removing gills or entrails. All, except 15 or 20 per cent. which are sold to wholesale dealers within the city, are put into barrels, loose with ice, ready for shipment in filling orders. None are placed in cold storage plants. All are shipped from the wharf as fast as they can be re-iced, washed, handled and loaded as above stated. Nearly all are shipped on the day they are unloaded from the boats. Occasionally, some are held in the ice boxes on the wharf for more than forty-eight hours. All are sold to wholesale dealers in quantities of from 50 to 400 pounds. None are sold to retailers.

"The tax is laid, not according to the weight of the fish when landed, but upon the fish sold. All that is sold, has been handled as above stated. None of it has remained in its original condition. None is in an original package, and little in its original form. This

is obviously true of the 75 per cent. which is beheaded and gutted and of the 7 to 10 per cent. more which is gutted and gilled with the heads on. But the small remainder is, when sold, no longer in its original condition. Before sale, it is washed and re-iced. It is taken from the bulk and put loose with ice in barrels. And all this has been done on the wharf. These facts make inapplicable cases like *Brown v. Maryland,* 12 Wheat. 419; *Low v. Austin,* 13 Wall. 29; *Cook v. Pennsylvania,* 97 U. S. 566. All the fish sold have, after landing and before laying the tax, been so acted upon as to become part of the common property of the State. They have lost their distinctive character as imports and have become taxable by the State. Compare *Sonneborn Bros. v. Cureton,* 262 U. S. 506."

█ The total amount of tax paid by Oxenberg Brothers on respondent's account was $908.23. This was the tax exacted on sales by Oxenberg Brothers of mild-cured fish shipped to purchasers in Chicago, Boston, and other points outside the state of Washington, including which were the sales to Oxenberg Brothers of Brooklyn, New York. Of the total of $908.23, there was paid on account of fish shipped to Oxenberg in Brooklyn for business taxes on behalf of respondent $895.45, as to which, appellants contend, respondent is not entitled to a refund.

Appellants concede that, as to the fish sold by Oxenberg Brothers, as sales agent of respondent, to buyers in New York, Chicago, and California, such sales were transactions in interstate commerce and that no tax is due upon such sales, but argue that, as to the tax of $895.45 levied on the sales of fish mild-cured at its Seattle plant by Oxenberg Brothers and shipped by them to Oxenberg Brothers, Brooklyn, New York, respondent is not entitled to a refund.

Orders were received by Oxenberg Brothers at Seattle as sales agent of respondent from Oxenberg Brothers of Brooklyn, New York, for fish at the market

price, f. o. b. Seattle, consigned to Brooklyn, New York. The sale was consummated in the same manner as sales to other out-of-state buyers. The price was approved by respondent and the fish immediately placed on cars f. o. b. Seattle, consigned to Oxenberg Brothers, Brooklyn, New York. A sight draft was immediately drawn on Oxenberg Brothers of Brooklyn, New York, for the purchase price.

Such transactions are interstate and not subject to taxation by the state. The fact that Oxenberg Brothers of Brooklyn had an agent or representative in Seattle did not change the character of the sale. The purchase price by draft was drawn on the buyer in New York for the fishermen, not Oxenberg Brothers in Seattle. The order was received from New York and the merchandise shipped to the New York buyer. Oxenberg Brothers in Seattle acted for the fishermen and the respondent, and pursuant to the order received from New York placed the fish on cars in Seattle, at the expense of the fishermen, consigned to New York.

In *Paramount Pictures Distributing Co. v. Henneford,* 184 Wash. 376, 51 P. (2d) 385, we held that a state tax on the business of a branch office or local exchange which received motion picture films from distributors outside this state and distributed the film to lessees who returned the films to the local exchange, which sent them back to the distributors, was a direct burden on interstate commerce and void where the tax was based upon a percentage of the gross receipts from interstate commerce. Certiorari to the supreme court of the United States was denied. *Henneford v. Paramount Pictures Distributing Co.,* 298 U. S. 665, 56 S. Ct. 747. That case, on principle, is not distinguishable from the case at bar. A more recent authority is *Gwin, White & Prince, Inc. v. Henneford,* 305 U. S. 434, 59 S. Ct. 325, in which the United States supreme court held

that a tax measured by the gross receipts of appellant from its business of marketing fruit shipped from Washington to the places of sale in various states is a burden on interstate commerce, therefore prohibited by the commerce provision of the Federal constitution.

■ Error is assigned on entry of money judgment against the three state tax commissioners as tax commissioners of the state of Washington.

Under Laws of 1935, chapter 180, § 199, p. 837, authorizing the proceeding for a refund, it is provided that the complaining taxpayer shall be deemed the plaintiff and the state of Washington shall be deemed the defendant. The statute does not contemplate the presence in the proceeding of any other defendant, otherwise provision would have been made for bringing in other parties. It follows that the only judgment of refund should be against the state of Washington alone and not against the tax commissioners, who, as counsel for the state correctly contend, have no place in such special proceeding.

■ For the first time—the question was not suggested in the trial court—appellants complain that $893.10 of the tax paid by Oxenberg Brothers was not shown by respondent to have been paid within one year, as required by Laws of 1935, chapter 180, § 199, from the date of commencement of the proceeding for refund, hence recovery is barred.

If action was not instituted within time by respondent, that would be an affirmative defense to be interposed by appellants. It is a statute of limitation, which is always an affirmative defense which may be urged or waived (*McDonald v. McDonald*, 144 Wash. 358, 258 Pac. 10); and such defense will not be considered when raised for the first time on appeal. 17 R. C. L. 986.

The judgment is reversed, and the cause remanded

432

with direction to the trial court to enter judgment in harmony with this opinion.

BLAKE, C. J., BEALS, GERAGHTY, and SIMPSON, JJ., concur.

### ON REHEARING.

[*En Banc.* June 29, 1939.]

PER CURIAM.—Upon a rehearing *En Banc*, the court adheres to the Departmental opinion heretofore filed herein.

