[No. 28558. Department Two. February 27, 1942.]

NORTH PACIFIC COAST FREIGHT BUREAU, *Respondent,* v. THE STATE OF WASHINGTON, *Appellant.*[1]

[1]Reported in 122 P. (2d) 467.

564

*The Attorney General, Ralph B. Sproule,* and *Max Kaminoff, Assistants,* for appellant.

*J. N. Davis, Thos. H. Maguire, E. C. Matthias, A. J. Clynch, F. T. Merritt, Robert S. Macfarlane, Dean H. Eastman,* and *Earl F. Requa,* for respondent.

JEFFERS, J.—This is an appeal by defendant, state of Washington, from a judgment entered by the superior court for Thurston county, decreeing that an occupation tax in the sum of $739.13, assessed by the tax commission of the state of Washington against and paid by plaintiff, North Pacific Coast Freight Bureau, be refunded.

Plaintiff, North Pacific Coast Freight Bureau, is maintained by various railroads operating in Washington, Oregon, Idaho, and British Columbia. It maintains offices in Seattle, Washington. The bureau is not a corporation, and has no stock or shares. No dividends

of any kind are paid by it to the member lines. The purpose for which the bureau was established and is maintained is best shown by the testimony of W. J. Bohon, the only witness who testified in the case, and who stated that he was the managing agent for the railroads of the bureau.

"Q. Will you just explain briefly for what purpose the plaintiff bureau is maintained by the companies you named? A. Well, the primary and principal purpose is for the publication of freight tariffs and supplements that are required by the Interstate Commerce Commission and various state commissions, which service we perform for all the railroads in lieu of them doing that for their own account. It tends for uniformity throughout the territory where they are competitive. One agency such as myself, in publishing rates, does so on one uniform date, whereas, if they were doing that themselves it could not always be done. . . . Q. Now, for the purpose, Mr. Bohon, of publishing these tariffs for the lines, have each of the rail carriers appointed you as their agent, that is you individually, and have they given you the power of attorney? A. Yes. It is the requirement of the Interstate Commerce Commission and also the state that each line for whom I act is required to file the power of attorney with the various commissions authorizing me to act for them and accepting responsibility for any acts I perform for them in the publishing of any freight rates. Q. And in the publication of these tariffs are the tariffs denominated as North Pacific Coast Freight Bureau tariffs, W. J. Bohon, Agent? A. Yes."

Mr. Bohon is in charge of the Seattle office, and there are about twelve employees in that office. These employees are hired by Mr. Bohon, who also has the power to discharge them.

"Q. Now will you explain how the general expenses of maintaining the bureau, and when I say general expenses I refer to office rents, salaries for you as agent, and the clerks and stenographers, stationery and supplies; how are those general expenses paid by the mem-

ber lines? A. They are prorated monthly, in fact we clear our accounts each month on the basis of percentage proportionate to each line. That is computed upon the interest that line has in the work we perform. . . . Q. Isn't that apportionment of expense based primarily upon a mileage basis? A. Yes. . . . Q. Now, in addition to the general expenses, Mr. Bohon, there are the expenses of compiling, publishing and distributing the tariffs which you publish for the member lines? A. Yes. Q. Will you just explain briefly, first what those expenses are in connection with the publication of tariffs which the member lines ultimately pay? A. First we—first I will mention the cost of printing. All of our tariffs are printed and that cost —that is so much per page. That cost plus costs in preparing the matter for publication and some mailing room cost and distribution of these tariffs and supplements to our member lines and shippers and the postage and express charges in distribution all go to make up the cost to the members for the publication of the tariffs. . . . Q. Now, then, that total expense incidental to the getting out and distribution of these tariffs, how is that charged or paid by the member lines and on what basis? A. Those costs are entirely upon a distributional basis. . . . Q. Now, how are these general expenses and the tariff expenses which are apportioned to the member lines as you have indicated, paid to the bureau, how are the payments made? A. At the end of each month I have a stenographer that prepares a statement showing all of our expenses and the apportionment as between general expenses and tariff expenses and this statement is furnished the traffic departments and accounting departments of all the member lines for the month in which the expenses were incurred and on that statement is reference to the fact that on the fifteenth of the month following we will draw a draft on them for their proportionment and to carry that out further we—for twenty years we have been drawing those drafts as cash."

Mr. Bohon was then handed a copy of a statement made out by the bureau for the month of August, 1935, which was typical of the statements sent each month

by the bureau to the member lines. This statement, marked and introduced as exhibit one, shows, among other things, that the total expense of the bureau for that month was $4,080.34. It also shows that in that month the bureau received the sum of $1,075, for furnishing tariffs and supplements to railroads through the United States, and certain boat lines, which were not members of the bureau. This amount received from nonmember lines is credited to the various member lines.

It does not appear that the bureau has any income other than as above indicated. It further appears that the bureau hires the printing done, as it has no facilities for doing that work. It also appears from the testimony of Mr. Bohon that the bureau charges nonmember lines for tariffs furnished a greater sum than the actual expense taken back from the member lines.

Holding that the bureau, in preparing, compiling, and furnishing tariffs and supplements to its members and nonmembers, was engaged in business activities in the state of Washington, within the meaning of the 1935 business and occupation tax law (title II, chapter 180, p. 709, Laws of 1935, Rem. Rev. Stat. (Sup.), § 8370-4 [P. C. § 7030-64] *et seq.*), the tax commission levied an assessment against the bureau, for the period from May 1, 1935, to December 31, 1937, under the classification "service and other business activities" (§ 4 (e)), in the amount of $739.13, representing one-half of one per cent of the gross income of the business. The bureau paid these taxes under protest, and petitioned the tax commission for abatement and refund of the taxes. The bureau's petition for refund was denied by the tax commission, and, on appeal by the bureau to the superior court for Thurston county, the trial court entered judgment refunding to the bureau the taxes paid, and this appeal by the state follows.

Assignments of error are:   (1) The court erred in holding that respondent bureau was not engaged in business activities within the state of Washington; (2) the court erred in finding that the income received by respondent bureau did not constitute gross income of the business upon which a business and occupation tax could be assessed; (3) the court erred in concluding that the tax commission's assessment of the business and occupation tax was illegal and void; (4) the court erred in entering judgment for respondent and against appellant.

While they are closely related and might be stated together, we think there are two questions presented here:   (1) Was appellant bureau engaging in business, and subject to the business and occupation tax?  (2) If the bureau was so engaged, did it receive any gross income from the business, upon which an occupation tax could be assessed?

The occupation tax is title II, chapter 180, p. 709, Laws of 1935.   The pertinent sections of the act here to be considered are:

"Sec. 4.  From and after the first day of May, 1935, there is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities.   Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows:   . . ." (Rem. Rev. Stat. (Sup.), § 8370-4 [P. C. § 7030-64]).

Then follow subdivisions (a) concerning extractors; (b) manufacturers; (c) retailers; (d) wholesalers; and (e) under which the tax here in question was assessed. This subdivision provides:

"(e)  Upon every person engaging within this state in any business activity other than or in addition to those enumerated in subsections (a), (b), (c) and (d) above; as to such persons the amount of tax on account

of such activities shall be equal to the gross income of the business multiplied by the rate of one-half of one per cent.   . . ."

Section 5 defines the various words and phrases used in the act.   The following subdivisions of § 5 are pertinent:

"(b)  The word 'person' or word 'company,' herein used interchangeably, means any individual, receiver, assignee, trustee in bankruptcy, trust, estate, firm, co-partnership, joint venture, club, company, joint-stock company, business trust, municipal corporation, corporation, association, society, or any group of individuals acting as a unit, whether mutual, co-operative, fraternal, non-profit or otherwise;

"(g)  The term 'gross income of the business' means the value proceeding or accruing by reason of the transaction of the business engaged in and includes gross proceeds of sales, compensation for the rendition of services, gains realized from trading in stocks, bonds or other evidences of indebtedness, interest, discount, rents, royalties, fees, commissions, dividends, and other emoluments however designated, *all without any deduction on account of* the cost of tangible property sold, *the cost of materials used, labor costs,* interest, discount, *delivery costs,* taxes *or any other expense whatsoever paid or accrued* and without any deduction on account of losses;

"(h)  The term 'value proceeding or accruing' means the consideration, whether money, credits, rights or other property, expressed in terms of money, actually received or accrued.   The term shall be applied, in each case, on a cash receipts or accrual basis according to which method of accounting is regularly employed in keeping the books of the taxpayer.   The tax commission may provide by regulation that the value proceeding or accruing from sales on the installment plan under conditional contracts of sale may be reported as of the dates when the payments become due;

"(m)  The word 'business' includes all activities engaged in with the object of gain, benefit or advantage to the taxpayer *or to another person or class, directly or indirectly;*

"(n) The term 'engaging in business' means commencing, conducting or continuing in business and also the exercise of corporate or franchise powers as well as liquidating a business when the liquidators thereof hold themselves out to the public as conducting such business; . . . " (Italics ours.) (Rem. Rev. Stat. (Sup.), § 8370-5 [P. C. § 7030-65]).

"Sec. 11. The provisions of this title shall not apply to: . . .

"(g) Any person in respect to his employment in the capacity of an employee or servant as distinguished from that of an independent contractor; . . . " (Rem. Rev. Stat. (Sup.), § 8370-11 [P. C. § 7030-71]).

Respondent contends that the bureau was not engaged in business under the provisions of the act, arguing that the employees of the bureau are in fact the agents and employees of the several railroads, and the compensation paid them and the reimbursements of general and tariff expenses incurred incident to their services are exempt under § 11, subdivision (g), *supra*.

Respondent argues that the situation here presented is no different than if one of the member railroads had employed Mr. Bohon and certain clerks and stenographers, for the purpose of preparing and publishing tariffs naming the transportation rates to be charged by it, and such railroad itself had paid the salaries of the agent and clerks, and the expenses incident to such operation, in which case it is contended there would be no basis for a tax with respect to such payment.

██ ██ We fully realize that the statute, § 11 (g), recognizes an exemption where the relationship of employer and employee exists, and we agree that where such relationship is established a tax may not be imposed upon the wages of such employee. We also recognize that an employee may have more than one employer. However, we are of the opinion that the exemption above referred to was not intended to apply to

an activity such at least as was shown by this record to have been conducted by the bureau. In the first place, we are of the opinion it does not appear from the record that Mr. Bohon and those employed by him to assist in the operation of the bureau are in fact employees of the member railroads, within the meaning of the word "employee" as used in § 11 (g). In the second place, the tax here in question was not levied upon the salaries of Mr. Bohon and the other employees of the bureau, as such, but upon the income received by the bureau. In the third place, the fact that Mr. Bohon purports to act under power of attorney from the different member lines is not convincing to us that the relationship of employer and employee exists between Mr. Bohon and the employees of the bureau and the member lines. We stated in *Fisher's Blend Station v. State Tax Commission,* 182 Wash. 163, 45 P. (2d) 942:

"Statutes providing for the raising of revenue required by the state in carrying on its functions are vital to its welfare, and a person, natural or artificial, should not be declared exempt from the payment of a tax required of business generally, unless it clearly appears that the constitution and laws of the United States (or of the state) require such exemption."

In considering the meaning of the terms "business" and "engaging in business," we must accept the definition of those terms found in the act. 59 C. J. 948, § 567.

There can be no question but that respondent is a "person," under the definition of that word in § 5 (b) of the act, and this would be true whether the bureau itself is a nonprofit organization or not. It is plain to us that a benefit is obtained by the member railroads from the operation of the bureau, thus bringing the activities of the bureau within the definition of "business," under § 5 (m). This conclusion is inescapable,

when the testimony of Mr. Bohon is considered. Not only do the member railroads receive a benefit in the way of uniformity and economy resulting from the operation of the bureau, rather than having the tariffs and supplements issued by each member railroad, but the bureau also furnishes tariffs and supplements to nonmember railroads and to certain boat lines, and the income from this source, in the month heretofore referred to, was $1,075, the charge to these nonmember lines being in excess of the charge made to the member lines. The amounts received from nonmember lines are credited by the bureau against the charges made to the member lines, thereby materially reducing the sums paid by the member lines for their tariffs and supplements. Respondent refers to these amounts received from nonmember lines as inconsequential, but, as hereinbefore stated, in the statement introduced as exhibit one, it appears that in that month the bureau received approximately one thousand dollars from nonmember lines, while the entire cost of operating the bureau for that month was $4,080.34.

We also have here the bureau, in its own name, not the railroads, maintaining this action. It further appears from the testimony of Mr. Bohon that he hires and fires all the help in the Seattle office; that the bureau hires the printing done; that it receives the amounts paid by nonmembers; in fact, in so far as the record shows, the bureau deals with the public and conducts its office as a separate and distinct business entity, and we do not overlook the fact that the member railroads determine what rates shall be published. As stated by Mr. Bohon: "The railroads themselves provide the rates we are to publish, and it is up to us to put them in proper form." There is nothing in the record to show that any of the equipment used in the office of the bureau was furnished by, or belongs to,

the member railroads. It does not appear that checks are issued by the member railroads to Mr. Bohon, or any of the employees of the bureau, but at the end of each month a draft is drawn by the bureau on the member lines, we presume payable to the bureau, and it would seem to be a fair inference that Mr. Bohon then draws checks on the bureau account to pay the salaries of the employees and the other expenses of operation.

No case has been cited, and we have been unable to find one, which seems to directly answer the questions here raised. However, appellant has called our attention to the case of *Yakima Fruit Growers Ass'n v. Henneford,* 187 Wash. 252, 60 P. (2d) 62, wherein certain sections of the 1935 occupation tax law were considered, and it was held that the Yakima County Horticultural Union, a nonprofit cooperative company, came within the definition of engaging in business, under the act, and was subject to the tax imposed as to its activities of warehousing, cold storage and sale of fruit. See, also, *Peninsula Light Co. v. State Tax Commission,* 185 Wash. 669, 56 P. (2d) 720; *Fishermen's Cooperative Ass'n v. State,* 198 Wash. 413, 88 P. (2d) 593. We stated in *Yakima Fruit Growers Ass'n v. Henneford, supra:*

"The 1935 statute provides that there shall be collected from every person a tax for the act or privilege of engaging in 'business' activities. 'Business' includes all activities engaged in with the object of gain, benefit or advantage to the taxpayer *or to another person or class,* directly or indirectly. Included within the word 'person' are groups of individuals and corporations, non-profit or otherwise, such as respondents. Under the provisions of Title II, chapter 180, Laws of 1935, p. 709, all are subject to the occupation tax unless exempted." (Italics ours.)

While it may be admitted that statements made by this court in the cases cited by appellant, and especi-

ally in the *Yakima Fruit Growers Ass'n* case, are persuasive of appellant's contention that the bureau, in the instant case, is "engaging in business," under the definition of that term and the word "business," as contained in the act, we do not feel justified in resting our conclusions on the cited case, and we have therefore considered the question here raised as one of first impression, and our conclusions are based upon what we believe to be a fair interpretation of the statutes and the facts in this case. We are of the opinion that, based on the statutes and the record in this case, it must be held that the bureau was "engaging in business."

As hereinbefore stated, the tax was levied on the "gross income" of the bureau, as that term is defined in § 5 (g). Respondent contends that the payments made to the bureau to cover the general and tariff expenses do not constitute income from business, arguing that the payments received by the bureau are not money or consideration received for any business transaction carried on by it, but are simply payments made through the bureau to cover compensation for services rendered by the agent, the clerks and stenographers, and to cover the office and other expenses incurred in connection with the preparation, publication, and distribution of the tariffs and supplements.

We are unable to follow respondent in its contention. We are convinced that, under the law and the facts in this case, the bureau is engaging in business, and we are also convinced that the sums received by it from member and nonmember railroads and boat lines constitute "gross income of the business," as that term is defined in § 5 (g). It seems to us that, under the facts of this case, the money received by the bureau constitutes value accruing to it by reason of the transaction of the business engaged in, and also constitutes compensation for the rendition of services.

We call attention to the fact that § 5 (g) also provides that no deduction shall be made on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or *any other expense whatsoever paid or accrued.*

While, as we have said, we do not believe the cases of *Yakima Fruit Growers Ass'n v. Henneford,* and *Peninsula Light Co. v. State Tax Commission, supra,* are conclusive of the questions raised in this case, they are persuasive of the fact that respondent's contention is erroneous, and that, if respondent's contention relative to the meaning of gross income were sustained, nonprofit corporations would not be liable for an occupation tax under the statute. We quote from the case of *Fishermen's Cooperative Ass'n v. State, supra:*

"We are clear that, under *Yakima Fruit Growers' Ass'n v. Henneford,* 187 Wash. 252, 60 P. (2d) 62, the activities of respondent cooperative corporation are not exempt from the operation of the tax act. While the members of the respondent association are its stockholders, and respondent as a corporation may not profit from its activities, it is plain that the association or corporation is the vehicle with, or the channel through, which the members who are stockholders conduct their activities cooperatively with the object of gain, benefit, or advantage to the association's members or stockholders of the corporation."

So, in the instant case, it seems to us the bureau is maintained as a separate entity or business, by the member railroads, for the purposes hereinbefore stated, with the object of benefit or advantage to such member lines, and that the money received by the bureau to carry on its operations was properly considered as gross income under the act.

For the reasons herein assigned, we are of the opinion the tax commission properly assessed a tax of one-half

of one per cent against respondent, and that it properly refused to refund the tax paid.

The judgment of the trial court is reversed, with instructions to enter judgment in favor of the state and against respondent, as herein indicated.

ROBINSON, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.

