## HOOVEN & ALLISON CO. *v.* EVATT, TAX COMMISSIONER OF OHIO.

No 38. Argued November 7, 8, 1944.—Decided April 9, 1945.

*Messrs. Luther Day* and *Curtis C. Williams, Jr.,* with whom *Mr. Frederick Woodbridge* was on the brief, for petitioner.

*Aubrey A. Wendt,* Assistant Attorney General of Ohio, with whom *Thomas J. Herbert,* Attorney General, was on the brief, for respondent.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Respondent, a tax official of the State of Ohio, has assessed for state ad valorem taxes certain bales of hemp and other fibers belonging to petitioner. The fibers had been brought from the Philippine Islands or from other places outside the United States. When assessed for the tax, they were stored in the original packages in which they had been imported, in petitioner's warehouse at its factory at Xenia, Ohio, preliminary to their use by petitioner in the manufacture of cordage and similar products.

The State Board of Tax Appeals sustained the assessment for the three years in question, 1938, 1939, and 1940. Petitioner then brought the present proceeding in the Supreme Court of Ohio to review the Board's determination. That court rejected petitioner's contention that the fibers are imports, immune from state taxation under Article I, § 10, Cl. 2, of the Constitution, which prohibits state taxation of imports or exports; and it sustained the tax. 142 Ohio St. 235, 51 N. E. 2d 723.

The State Court recognized that *Brown* v. *Maryland,* 12 Wheat. 419, established the rule that imports in their original packages may not be taxed by a state. But it thought that the present case fell within the qualification upon that rule laid down in *Waring* v. *The Mayor,* 8 Wall. 110. The *Waring* case held that since a purpose of importation is sale, imports are immune from state taxation only so long as they are in the hands of the importer, and lose their immunity upon being sold by him. The Supreme Court of Ohio held that petitioner acquired title to the merchandise here taxed after its arrival in this country. It concluded from this that the foreign

sellers or their agents, and not petitioner, were the importers, and that the merchandise, after the sale to petitioner, had ceased to be an import constitutionally immune from state taxation.

In any case, the Ohio court thought that even if petitioner were the importer and the merchandise were immune from taxation on its receipt by petitioner, it nevertheless ceased to be an import, and lost its immunity as such, upon its storage at petitioner's warehouse, awaiting its use in manufacturing. The Court thought that *Brown* v. *Maryland, supra,* laid down a rule applicable only to imports for the purpose of sale, and that imports for use became, upon storage, even if still in the original package, so intermingled with the common mass of property within the state as to be subject to the state power of taxation.[1] The Court found it unnecessary to decide whether the fibers brought from the Philippine Islands, which are not a foreign country, could be imports within the meaning of the constitutional immunity, since they would be taxable in any event upon the two grounds already stated.

We granted certiorari, 321 U. S. 762, because of the novelty and importance of the constitutional questions raised. The questions for decision are (1) whether, with respect to the fibers brought from foreign countries, petitioner was their importer; if so, (2) whether, as stored in petitioner's warehouse, they continued to be imports at the time of the tax assessment; and (3) whether the fibers brought from the Philippine Islands, despite the place of their origin, are likewise imports rendered immune from taxation by the constitutional provision.

The Constitution confers on Congress the power to lay and collect import duties, Art. I, § 8, and provides that "No

---

[1] The Supreme Court of Washington has held contrary to the decision of the Ohio Court. See *Washington Chocolate Co.* v. *King County,* 21 Wash. 2d 630, 152 P. 2d 981.

State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws . . ." Art. I, § 10, Cl. 2. These provisions were intended to confer on the national government the exclusive power to tax importations of goods into the United States. That the constitutional prohibition necessarily extends to state taxation of things imported, after their arrival here and so long as they remain imports, sufficiently appears from the language of the constitutional provision itself and its exposition by Chief Justice Marshall in *Brown* v. *Maryland, supra.* We do not understand anyone to challenge that rule in this case.

It is obvious that if the states were left free to tax things imported after they are introduced into the country and before they are devoted to the use for which they are imported, the purpose of the constitutional prohibition would be defeated. The fears of the framers, that importation could be subjected to the burden of unequal local taxation by the seaboard, at the expense of the interior states, would be realized, as effectively as though the states had been authorized to lay import duties.[2] It is evident, too, that if the tax immunity of imports, commanded by the Constitution, is to be reconciled with the right of the states to tax goods after their importation has become complete and they have become a part of the common mass of property within a state, "there must be a point of time when the prohibition ceases, and the power of the state to tax commences." *Brown* v. *Maryland, supra,* 441.

In *Brown* v. *Maryland, supra,* the state sought to impose a license tax on the sale by the importer of goods stored in his warehouse in the original packages in which they

---

[2] See Madison, Debates in the Federal Convention of 1787, August 28, 1787 (Hunt & Scott ed.).

were imported. In holding the levy to be a prohibited tax on imports, Chief Justice Marshall said (pp. 441–442):

"It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports, to escape the prohibition in the constitution."

Although one Justice dissented in *Brown* v. *Maryland, supra,* from that day to this, this Court has held, without a dissenting voice, that things imported are imports entitled to the immunity conferred by the Constitution; that that immunity survives their arrival in this country and continues until they are sold, removed from the original package, or put to the use for which they are imported. *Waring* v. *The Mayor, supra,* 122–123; *Low* v. *Austin,* 13 Wall. 29, 32–33; *Cook* v. *Pennsylvania,* 97 U. S. 566, 573; *May* v. *New Orleans,* 178 U. S. 496, 501, 507–508; *Burke* v. *Wells,* 208 U. S. 14, 21–22, 24; *Gulf Fisheries Co.* v. *MacInerney,* 276 U. S. 124, 126–127; *McGoldrick* v. *Gulf Oil Corp.,* 309 U. S. 414, 423.

All the taxed fibers, with the exception of those brought from the Philippine Islands, which will presently be separately considered, were brought to this country from foreign lands and were undoubtedly imports, clothed as such with a tax immunity which survived their importation, until the happening of some event sufficient to alter their character as imports. As we have said, the Supreme Court of Ohio found such events in what it deemed to be a sale of the merchandise to petitioner after it had been landed in the United States, and in the further cir-

cumstance that by storing the merchandise in the warehouse at petitioner's factory, it had become a part of the common mass of property subject to state taxation and so could no longer be regarded as an import.

Resolution of either point in favor of respondent is decisive of the case. Hence we must first consider whether petitioner, rather than the foreign producers or shippers acting through their American agents, was the importer. If so, the tax immunity of the imported merchandise survived its receipt by petitioner and we must determine the further question whether petitioner's subsequent treatment of the merchandise deprived it of its character, and hence its immunity, as an import.

I

Petitioner's relationship to the merchandise at the time of importation and afterward is of significance only in determining whether, as the state court has found, the relationship was so altered after importation that it can be said that the purpose of the importation had been fulfilled. If it had, there was no longer either occasion or reason for the further survival of the immunity from taxation. That relationship is to be ascertained by reference to all the circumstances attending the importation, particularly as shown by the long established course of business by which petitioner's supply of fibers has been brought into the country for use in manufacturing its finished product.

The state introduced no evidence, and there is no dispute in point of substance as to petitioner's evidence. The latter consists of the oral testimony of petitioner's general manager, some examples of the contracts by which petitioner procured the merchandise to be brought to this country, and two stipulations containing statements, admitted to be true, which were made by the American agents of the producers and shippers of the merchandise.

Both the Board of Tax Appeals and the state court, without specially finding some of the facts which we regard as of controlling significance, contented themselves with stating the facts generally. They inferred from these facts that petitioner technically was but a purchaser of the merchandise, after it had been imported into this country. They concluded that petitioner was not the importer, and the fibers had ceased to be imports after the sale to petitioner.

In all cases coming to us from a state court, we pay great deference to its determinations of fact. But when the existence of an asserted federal right or immunity depends upon the appraisal of undisputed facts of record, or where reference to the facts is necessary to the determination of the precise meaning of the federal right or immunity, as applied, we are free to reexamine the facts as well as the law in order to determine for ourselves whether the asserted right or immunity is to be sustained. *Kansas City Southern R. Co.* v. *Albers Commission Co.*, 223 U. S. 573, 591; *Truax* v. *Corrigan*, 257 U. S. 312, 325; *First National Bank* v. *Hartford*, 273 U. S. 548, 552, and cases cited; *Fiske* v. *Kansas*, 274 U. S. 380, 385–386; *Norris* v. *Alabama*, 294 U. S. 587, 589–590.

In this case it appears without contradiction that petitioner, in the regular course of its business, contracts for its manufacturing requirements of hemp, jute, sisal and other fibers, before their shipment to this country, and sometimes even before they are produced in the various foreign countries of their origin. Petitioner's negotiations for the purchase are carried on with brokers located in New York City, who represent the foreign producers. After an agreement as to price, petitioner enters into a firm contract to purchase the fibers. A standard form of contract is executed in duplicate or triplicate by petitioner and the broker who signs as agent for or "for account of" his named principal. The contract specifies

the kind and amount of fibers purchased, the time of shipment, the American port to which the shipment is to be made, and frequently the steamship company, designated by petitioner, upon whose vessel the merchandise is to be shipped. While the contract gave the seller the option to make deliveries from merchandise warehoused in the United States, no such deliveries were made of any of the merchandise here in question.

The price is a "landed price," which includes as its components the contract cost of the goods at point of origin, the normal charges for ocean freight, marine and war risk insurance and United States customs clearance (including customs duties in the case of hemp, which alone of the purchased merchandise is subject to import duties), and the expense of arranging for transshipment from the port of entry to petitioner at Xenia, Ohio. Any variation from the normal rates for these components (other than the contract cost of the goods at point of origin) is for account of petitioner. "Extra value" insurance covering any increase in value of the merchandise over the contract price during the voyage, is effected, if petitioner requests, at its expense.

Upon shipment the merchandise is consigned to the broker in this country or to a banker, either on an order or a straight bill of lading, in either case with directions to "Notify The Hooven & Allison Co." When the bales of purchased merchandise are loaded for shipment on board vessel at the point of origin, they are given distinctive markings referable to petitioner's contract. A declaration is then cabled to the New York broker referring to the contract upon which the shipment is made, stating the name of the vessel, the approximate number of bales shipped, their identification marks, and the approximate date of arrival in the United States. The broker communicates this information to petitioner and sometimes follows it before arrival of the shipment at the port of entry, with

a *pro forma* invoice, which states the approximate tonnage and value of the shipment. Petitioner then gives instructions to the broker for the shipment from the port to Xenia.

The broker enters the shipment at the custom house in its own name as an accommodation to the petitioner, which has no facilities for clearance of the goods through the customs. The broker then ships the merchandise upon a straight bill of lading to Xenia, where it is delivered by the carrier to petitioner. At that time petitioner pays the freight, and ten to fifteen days after the receipt of the final invoice, it pays the purchase price to the broker. It is stipulated that the sale is upon the unsecured credit of petitioner and it does not appear that there is any retention of a security title either by the foreign seller, the broker, or any intervening banker, to secure payment by petitioner of the purchase price.

From all this it is clear that from the beginning, after the contract of purchase is signed, the foreign producer is obligated to sell the merchandise on credit, to ship it to an American port and to deliver it to petitioner, which is obligated to accept and pay for it. Performance of the contract calls for, and necessarily results in, importation of the merchandise from its country of origin to the United States. Petitioner's contracts of purchase are the inducing and efficient cause of bringing the merchandise into the country, which is importation. Examination of the documents and consideration of the course of business can leave no doubt that the petitioner not only causes the importation but that the purpose and necessary consequence of it are to supply petitioner with the raw material for its manufacture of cordage at its factory in Ohio.

From the moment of shipment the taxed merchandise was identified and appropriated to the purchase contract and to that ultimate purpose, by both the seller and the buyer. Petitioner could resell the merchandise while it

was in transit. The risk of loss from change in market value was on petitioner, save as it might insure against such loss at its own expense. The right to demand, receive and use the merchandise, subject only to the payment of the contract "landed price," was in petitioner. And obviously if the possibility of the seller's right of stoppage *in transitu,* the carrier's lien or the necessity of payment of customs duties are to be regarded as inconsistent with importation, there would be few importations and few importers in the constitutional sense. For there are few who are not subject to some or all of these contingencies.

Here it is agreed that the sale was on credit. So far as appears in those instances where the merchandise was consigned to a banker, it was for the purpose of financing the producer or shipper, pending receipt of the merchandise and payment for it by petitioner, which appears always to have purchased on credit and to have received the merchandise before payment, and never to have given security for its payment. There was therefore no occasion for an implied reservation of a security "title" as against petitioner in either the sellers or their agents, or the banker in those cases where the goods were consigned on shipment to a banker.

For the purpose of determining whether petitioner was the importer in the constitutional sense, it is immaterial whether the title to the merchandise imported vested in him who caused it to be brought to this country at the time of shipment or only after its arrival here.[3] Decision in *Waring* v. *The Mayor, supra,* upon which the Supreme Court of Ohio relied, did not turn on technical questions

---

[3] Section 1483 (1) of 19 U. S. C. provides that merchandise imported into the United States "shall be held to be the property of the person to whom the same is consigned." We do not deem this provision to be significant here, since it is designed merely to identify the person liable for the payment of customs duties, and since, as we have said, the time when title passes to petitioner is immaterial to decision.

of passage of title.[4]  For in determining the meaning and application of the constitutional provision, we are concerned with matters of substance, not of form.  When the merchandise is brought from another country to this, the extent of its immunity from state taxation turns on the essential nature of the transaction, considered in the light of the constitutional purpose, and not on the formalities with which the importation is conducted or on the technical procedures by which it is effected.  It is common knowledge to lawyers and businessmen that vast quantities of merchandise are annually imported into this country by purchasers resident here, for sale or manufacture here.  Sometimes the buyer completes the purchase abroad, in person, and ships to this country; sometimes, as in this case, the purchase is on unsecured credit, but more often it is under contracts by which the vendor reserves in himself or his agent or a banker a lien or title as security for payment of the purchase price on or after arrival.  To say that the purchaser is any the less an importer in the one case than in the others, is to ignore

---

[4] In the *Waring* case, the purchaser, claiming tax immunity as the importer, purchased the merchandise, after its shipment from abroad, from the American consignee, sometimes before and sometimes after its arrival in the port of entry.  Risk of loss was to be on the seller until the merchandise was entered at the customhouse and delivered from the vessel into the purchaser's lighters alongside.  The Court thought it immaterial whether the purchase contract was entered into before or after arrival.  Since the risk of loss remained on the shipper until the customhouse entry and delivery to the purchaser, it held that the shipper or the consignee was the importer; that the purchaser's sale of the goods, which was taxed, was the second sale after importation, and for that reason was not free of tax.  In these circumstances it is clear that the purchaser was not the cause of the importation, that the purchaser had no control over or right to demand the merchandise before arrival in port and that the foreign shipper, who bore the risk of loss and retained control of the merchandise and the right to control it until its delivery to petitioner, was the importer.

the constitutional purpose and substitute form for substance.

As we have said, the constitutional purpose is to protect the exclusive power of the national government to tax imports and to prevent what in matter of substance would amount to the imposition of additional import duties by states in which the property might be found or stored before its sale or use. It is evident that the constitutional prohibition envisages the present transaction, quite as much as if the petitioner had sent his own agent abroad where he had purchased and paid for the merchandise and shipped it to petitioner in this country. The purpose and result of the transaction are the same in either case. The apprehended evils of the local taxation of imports after their arrival here are the same.

It is enough for present purposes that the merchandise in this case was imported; and that petitioner was the efficient cause of its importation, the purpose and effect of which was petitioner's acquisition of the merchandise for its manufacture into finished goods. We conclude that petitioner was the importer, and that the merchandise in its hands was entitled to the constitutional tax immunity, surviving delivery of the imports to it.

## II

We turn now to the question whether the immunity was lost by the storage of the merchandise in the original packages in petitioner's warehouse at its factory, pending its use in petitioner's manufacturing operations. For the purpose of the immunity it has not been thought, nor is there reason for supposing, that it matters whether the imported merchandise is stored in the original package in the importer's warehouse at the port of entry or in an interior state. The reason for the original package doctrine, as fully expounded in *Brown* v. *Maryland, supra,* is that un-

less the immunity survives to some extent the arrival of the merchandise in the United States, the immunity itself would be destroyed. For there is no purpose of taxing importation, itself, even its ultimate suppression, which could not be equally accomplished by laying a like tax on things imported after their arrival and while they are in the hands of the importer.

On the other hand, the immunity is adequately protected and the state power to tax is adequately safeguarded if, as has been the case ever since *Brown* v. *Maryland, supra,* an import is deemed to retain its character as such "while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported," see *Brown* v. *Maryland, supra,* 442, or until put to the use for which it was imported. Chief Justice Marshall, in *Brown* v. *Maryland, supra,* pp. 442–443, rejected the suggestion that "an importer may bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation." Plainly if and when removed from the package in which they are imported or when used for the purpose for which they are imported, they cease to be imports and their tax exemption is at an end. It is quite another matter to say, and Chief Justice Marshall did not say, that because they may be taxed when used, the importer may not hold them tax free until the original packages are broken or until they are put to the use for which they are imported. He said, p. 443: "The same observations [i. e., the importer has mixed the goods with the common mass of property, rendering them taxable] apply to plate, or other furniture *used* by the importer." (Italics added.)

We have often indicated the difference in this respect between the local taxation of imports in the original package and the like taxation of goods, either before or after their shipment in interstate commerce. In the one case

666

the immunity derives from the prohibition upon taxation of the imported merchandise itself. In the other the immunity is only from such local regulation by taxation, as interferes with the constitutional power of Congress to regulate the commerce, whether the taxed merchandise is in the original package or not. The regulatory effect of a tax, otherwise permissible, is not in general affected by retention of the merchandise in the original package in which it has been transported. *Woodruff* v. *Parham*, 8 Wall. 123; *Brown* v. *Houston*, 114 U. S. 622; *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500, 521; *Sonneborn Bros.* v. *Cureton*, 262 U. S. 506, 508–513; *Baldwin* v. *Seelig*, 294 U. S. 511, 526–527.

This Court has pointed out on several occasions that imports for manufacture cease to be such and lose their constitutional immunity from state taxation when they are subjected to the manufacture for which they were imported, *May* v. *New Orleans, supra,* 501; *Gulf Fisheries Co.* v. *MacInerney, supra,* 126; *McGoldrick* v. *Gulf Oil Corp., supra,* 423, or when the original packages in which they were imported are broken, *Low* v. *Austin, supra,* 34; *May* v. *New Orleans, supra,* 508–509. But no opinion of this Court has ever said or intimated that imports held by the importer in the original package and before they were subjected to the manufacture for which they were imported, are liable to state taxation. On the contrary, Chief Justice Taney, in affirming the doctrine of *Brown* v. *Maryland,* in which he appeared as counsel for the State, declared, as we now affirm: "Indeed, goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the country, can in no just sense be regarded as a part of that mass of property in the state usually taxed for the support of state government." *License Cases,* 5 How, 504, 575.

In *Brown* v. *Maryland, supra,* the imported merchandise held in original packages in the importer's warehouse for sale, was deemed tax immune. We do not perceive upon what grounds it can be thought that imports for manufacture lose their character as imports any sooner or more readily than imports for sale. The constitutional necessity that the immunity, if it is to be preserved at all, survive the landing of the merchandise in the United States and continue until a point is reached, capable of practical determination, when it can fairly be said that it has become a part of the mass of taxable property within a state, is the same in both cases.

It cannot be said that the fibers were subjected to manufacture when they were placed in petitioner's warehouse in their original packages. And it is unnecessary to decide whether, for purposes of the constitutional immunity, the presence of some fibers in the factory was so essential to current manufacturing requirements that they could be said to have entered the process of manufacture, and hence were already put to the use for which they were imported, before they were removed from the original packages. Even though the inventory of raw material required to be kept on hand to meet the current operational needs of a manufacturing business could be thought to have then entered the manufacturing process, the decision of the Ohio Supreme Court did not rest on that ground, and the record affords no basis for saying that any part of petitioner's fibers, stored in its warehouse, were required to meet such immediate current needs. Hence we have no occasion to consider that question.

It is said that our decision will result in discrimination against domestic and in favor of foreign producers of goods. But such discriminations as there may be are implicit in the constitutional provision and in its pur-

pose to protect imports from state taxation. It is also suggested that it will be difficult to ascertain in particular cases when an original package is broken, a difficulty which arises, not out of the present decision, but out of the original package rule itself, which we do not understand to be challenged here. Moreover, this supposed difficulty does not seem to have baffled judicial decision in any case in the more than a hundred years which have followed the decision in *Brown* v. *Maryland, supra.*

As was emphasized in *Brown* v. *Maryland, supra,* the reconciliation of the competing demands of the constitutional immunity and of the state's power to tax, is an extremely practical matter. In view of the fact that the Constitution gives Congress authority to consent to state taxation of imports and hence to lay down its own test for determining when the immunity ends, we see no convincing practical reason for abandoning the test which has been applied for more than a century, or why, if we are to retain it in the case of imports for sale, we should reject it in the case of imports for manufacture. Unless we are to ignore the constitutional prohibition we cannot say that imports for manufacture are not entitled to the immunity which the Constitution commands, and we see no theoretical or practical grounds for saying, more than in the case of goods imported for sale, that the immunity ends while they are in the original package and before they are devoted to the purpose for which they were imported.

## III

There remains the question whether the fibers which petitioner brought from the Philippine Islands and stored in its warehouse in the original packages are also imports, constitutionally immune from state taxation.

Respondents argue that the Philippine Islands are not a foreign country and that only articles brought here

from foreign countries are imports within the meaning of the constitutional provision. Goods transported from one state to another are not imports, since they are articles originating in the United States and not brought into it. *Woodruff* v. *Parham, supra; Sonneborn Bros.* v. *Cureton, supra; Baldwin* v. *Seelig, supra.* It is petitioner's argument that merchandise brought from the Philippines to the United States is an import because it is brought into the United States from a place without, even though not from a foreign country. Implicit in this argument is the contention that the Philippines, while belonging to the United States as a sovereign, are not part of it; and that merchandise brought from the Philippines is an import because it originates outside of and is brought into the territory comprising the several states which are united under and by the Constitution, territory in which the constitutional prohibition against the state taxation of imports, is alone applicable.

The Constitution provides us with no definition of the term "imports" other than such as is implicit in the word itself. Imports were defined by Chief Justice Marshall in *Brown* v. *Maryland, supra,* 437, as "things imported" and "articles brought into a country." He added: "If we appeal to usage for the meaning of the word, we shall receive the same answer. They are the articles themselves which are brought into the country."

He thus defined imports by reference not to their foreign origin but to the physical fact that they are articles brought into the country from some place without it. Since most imports originate in foreign countries, courts have not unnaturally fallen into the habit of referring to imports as things brought into this country from a foreign country. *Waring* v. *The Mayor, supra; Woodruff* v. *Parham, supra; Pittsburgh & Southern Coal Co.* v. *Louisiana,* 156 U. S. 590, 600; *Patapsco Guano Co.* v. *North Carolina,*

171 U. S. 345, 350; *May* v. *New Orleans, supra.*[5]   But the Constitution says nothing of the foreign origin of imports, and in none of these cases was it necessary to decision to formulate the rule in terms of origin in a foreign country. In each case the result would have been the same if the Court had treated imports merely as articles brought into the country from a point without.

Chief Justice Marshall's definition has received support in cases holding or suggesting that fish caught in the open sea and brought into this country are imports entitled to the constitutional protection, although they did not come from a foreign country.   *Gulf Fisheries Co.* v. *Darrouzet,* 17 F. 2d 374, 376; *Booth Fisheries Corp.* v. *Case,* 182 Wash. 392, 395, 47 P. 2d 834.   In *Gulf Fisheries Co.* v. *MacInerney, supra,* we found it unnecessary to decide the point.   In that case the fish had been subjected to a manufacturing process after their arrival in port and before they were taxed.   Hence, even if originally imports, they had ceased to be such and were no longer immune from the challenged state tax.   See also *Fishermen's Cooperative Assn.* v. *State,* 198 Wash. 413, 88 P. 2d 593.   The definition of imports as articles brought into the country finds support also in the circumstance that it has never been seriously doubted that merchandise brought into the United States from without is subject to the power of Congress to impose customs duties, even though the merchandise is not of foreign origin.   And the occasion for protecting the

---

[5] In *Dooley* v. *United States,* 183 U. S. 151, the Court sustained under the Foraker Act of April 12, 1900, c. 191, 31 Stat. 77, the levy and collection of a tax in Puerto Rico upon goods brought there from New York.   The tax was held to be a valid exercise of the power of Congress to enact laws for the government of a dependency acquired by treaty, see *Downes* v. *Bidwell,* 182 U. S. 244.   The Court stated also as an alternative ground, but one unnecessary for decision, that the levy was not a prohibited tax on exports, since Puerto Rico was not a foreign country.

power of the national government to lay and collect customs duties upon such merchandise, is precisely the same as in the case of that of foreign origin. Hence it is plain that such importations, although not of foreign origin, are within the design and purpose of the constitutional prohibition against the local taxation of imports.

We find it impossible to say that merely because merchandise, brought into the country from a place without, does not come from a foreign country, it is not an import envisaged by the words and purpose of the constitutional prohibition. The interpretation in *Brown* v. *Maryland, supra,* the occasional judicial decisions that foreign origin is not a necessary characteristic of imports so long as they are brought into the country from a place without it, and the purpose of the constitutional prohibition, are alike persuasive that there may be imports in the constitutional sense which do not have a foreign origin.

The fact that the merchandise here in question did not come from a foreign country, if the contention be accepted that the Philippines are not to be regarded as such, is therefore without significance. It is material only whether it came from a place *without* the "country." Hence, in determining what are imports for constitutional purposes, we must ascertain the territorial limits of the "country" into which they are brought. Obviously, if the Philippines are to be regarded as a part of the United States in this sense, merchandise brought from the Philippines to the United States would not be brought into the United States from a place without, and would not be imports, more than articles transported from one state to another.

The term "United States" may be used in any one of several senses. It may be merely the name of a sovereign occupying the position analogous to that of other sovereigns in the family of nations. It may designate the territory over which the sovereignty of the United States ex-

tends, or it may be the collective name of the states which are united by and under the Constitution.[6]

When *Brown* v. *Maryland, supra,* was decided, the United States was without dependencies or territories outside its then territorial boundaries on the North American continent, and the Court had before it only the question whether foreign articles brought into the State of Maryland could be subjected to state taxation. It seems plain that Chief Justice Marshall, in his reference to imports as articles brought into the country, could have had reference only to articles brought into a state which is one of the states united by and under the Constitution, and in which alone the constitutional prohibition here involved is applicable.

The relation of the Philippines to the United States, taken as the collective name of the states which are united by and under the Constitution, is in many respects different from the status of those areas which, when the Constitution was adopted, were brought under the control of Congress and which were ultimately organized into states of the United States. See *Balzac* v. *Porto Rico,* 258 U. S. 298, 304–305, and cases cited. Hence we do not stop to inquire whether articles brought into such territories or brought from such territories into a state, could have been regarded as imports, constitutionally immune from state taxation. We confine the present discussion to the question whether such articles, brought from the Philippines and introduced into the United States, are imports so immune.

We have adverted to the fact that the reasons for protecting from interference, by state taxation, the consti-

---

[6] See Langdell, "The Status of our New Territories," 12 Harv. L. Rev. 365, 371; see also Thayer, "Our New Possessions," 12 Harv. L. Rev. 464; Thayer, "The Insular Tariff Cases in the Supreme Court," 15 Harv. L. Rev. 164; Littlefield, "The Insular Cases," 15 Harv. L. Rev. 169, 281.

tutional power of the national government to collect customs duties, apply equally whether the merchandise brought into the country is of foreign origin or not. The Constitution has not made the foreign origin of articles imported the test of importation, but only their origin in a place over which the Constitution has not extended its commands with respect to imports and their taxation. Hence our question must be decided, not by determining whether the Philippines are a foreign country, as indeed they have been held not to be within the meaning of the general tariff laws of the United States, *Fourteen Diamond Rings* v. *United States*, 183 U. S. 176; cf. *De Lima* v. *Bidwell*, 182 U. S. 1; *Dooley* v. *United States*, 182 U. S. 222, and within the scope of other general laws, *Faber* v. *United States*, 221 U. S. 649; cf. *Huus* v. *New York & P. R. S. S. Co.*, 182 U. S. 392; *Gonzales* v. *Williams*, 192 U. S. 1; *West India Oil Co.* v. *Domenech*, 311 U. S. 20, but by determining whether they have been united governmentally with the United States by and under the Constitution.

That our dependencies, acquired by cession as the result of our war with Spain, are territories belonging to, but not a part of, the Union of states under the Constitution, was long since established by a series of decisions in this Court beginning with *The Insular Tax Cases* in 1901; *De Lima* v. *Bidwell, supra; Dooley* v. *United States, supra,* 182 U. S. 222; *Downes* v. *Bidwell,* 182 U. S. 244; *Dooley* v. *United States,* 183 U. S. 151; and see also *Public Utility Commissioners* v. *Ynchausti & Co.,* 251 U. S. 401, 406–407; *Balzac* v. *Porto Rico, supra.* This status has ever since been maintained in the practical construction of the Constitution by all the agencies of our government in dealing with our insular possessions. It is no longer doubted that the United States may acquire territory by conquest or by treaty, and may govern it through the exercise of the power of Congress conferred by § 3 of Article IV of the Constitution "to dispose of and make all needful Rules and Regu-

lations respecting the Territory or other Property belonging to the United States." *Dooley* v. *United States, supra,* 183 U. S. at 157; *Dorr* v. *United States,* 195 U. S. 138, 149; *Balzac* v. *Porto Rico, supra,* 305; *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 323.

In exercising this power, Congress is not subject to the same constitutional limitations, as when it is legislating for the United States. See *Downes* v. *Bidwell, supra; Hawaii* v. *Mankichi,* 190 U. S. 197; *Dorr* v. *United States, supra; Dowdell* v. *United States,* 221 U. S. 325, 332; *Ocampo* v. *United States,* 234 U. S. 91, 98; *Public Utility Commissioners* v. *Ynchausti & Co., supra,* 406–407; *Balzac* v. *Porto Rico, supra.* And in general the guaranties of the Constitution, save as they are limitations upon the exercise of executive and legislative power when exerted for or over our insular possessions, extend to them only as Congress, in the exercise of its legislative power over territory belonging to the United States, has made those guaranties applicable. See *Balzac* v. *Porto Rico, supra.* The constitutional restrictions on the power of Congress to deal with articles brought into or sent out of the United States, do not apply to articles brought into or sent out of the Philippines. Despite the restrictions of §§ 8 and 9 of Article I of the Constitution, such articles may be taxed by Congress and without apportionment. *Downes* v. *Bidwell, supra.* It follows that articles brought from the Philippines into the United States are imports in the sense that they are brought from territory, which is not a part of the United States, into the territory of the United States, organized by and under the Constitution, where alone the import clause of the Constitution is applicable.

The status of the Philippines as territory belonging to the United States, but not constitutionally united with it, has been maintained consistently in all the governmental relations between the Philippines and the United

States. Following the conquest of the Philippines, they were governed for a period under the war power. After annexation by the Treaty of Paris of December 10, 1898, military government was succeeded by a form of executive government. By the Spooner Amendment to the Army Appropriation Bill of March 2, 1901, c. 803, 31 Stat. 895, 910, it was provided that "all military, civil, and judicial powers necessary to govern the Philippine Islands . . . shall, until otherwise provided by Congress, be vested in such person and persons and shall be exercised in such manner as the President of the United States shall direct, for the establishment of civil government and for maintaining and protecting the inhabitants of said islands in the free enjoyment of their liberty, property, and religion . . ." On July 1, 1902 Congress provided for a complete system of civil government by the original Philippine Organic Act, c. 1369, 32 Stat. 691. Step by step Congress has conferred greater powers upon the territorial government, and those of the federal government have been diminished correspondingly, although Congress retains plenary power over the territorial government until such time as the Philippines are made independent. This process culminated in the Act of March 24, 1934, c. 84, 48 Stat. 456, providing for the independence of the islands. The adoption by the Philippines and approval by the United States of a constitution for the Commonwealth of the Philippine Islands, as provided by the Act, have prepared the way for their complete independence.

The Act of 1934 made special provisions for the relations between the two governments pending the final withdrawal of sovereignty of the United States from the Philippines and in particular provided for a limit on the number and amount of articles produced or manufactured in the Philippine Islands that might be "exported" to the United States free of duty. § 6. It provided for the complete withdrawal and surrender of all right of posses-

676

sion, supervision, jurisdiction, control or sovereignty of the United States over the Philippines on the 4th of July following the expiration of ten years from the date of the inauguration of the new government, organized under the Constitution provided for by the Independence Act.[7] § 10 (a). The new Philippine Constitution was adopted on February 8, 1935, and the new government under it was inaugurated on November 14, 1935. By the provisions of the Independence Act, the United States retained certain powers with respect to our trade relations with the Islands, with respect to their financial operations and currency, and the control of their foreign relations. The power of review by this Court of Philippine cases is continued and extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands. § 7 (6). Thus by the organization of the new Philippine government under the constitution of 1935, the Islands have been given, in many aspects, the status of an independent government, which has been reflected in its relations as such with the outside world.[8]

[7] Since the war with Japan and that country's temporary occupation of the Philippines, Congress has provided that the date of the independence of the Philippines may be advanced by the President of the United States, upon his proclamation of their liberation and the restoration of the normal functions of government. Act of June 29, 1944, c. 322, 58 Stat. 625.

[8] The Philippine Commonwealth participated as a signatory in the following: Agreement and Protocol Regarding Production and Marketing of Sugar of May 6, 1937; Universal Postal Convention of May 23, 1939; Declaration by United Nations of January 1, 1942 (the Philippines signed the Declaration on June 14, 1942); Agreement for United Nations Relief and Rehabilitation Administration of November 9, 1943; United Nations Monetary and Financial Conference at Bretton Woods, New Hampshire, of July 1 to 22, 1944; The Protocol Prolonging the International Agreement Regarding the Regulation of Production and Marketing of Sugar of August 31, 1944; The International Civil Aviation Conference of November 1 to December 7, 1944.

In the meantime, and ever since *The Insular Tax Cases, supra,* Congress has often treated as imports, articles brought to the United States from the Philippines. By the Act of August 29, 1916, c. 416, 39 Stat. 548, 48 U. S. C. § 1042, the territorial government of the Philippines was authorized to enact tariff laws. The Sugar Quota Law, 7 U. S. C. § 608a (1), defined as imports the amounts of sugar permitted to be brought into the United States from the Philippines, and prohibited such importation in excess of prescribed quotas. The Act of June 14, 1935, c. 240, 49 Stat. 340, 48 U. S. C. § 1236a, provided for restriction of the amount of hard fibers and its products which could be brought annually from the Philippines to the United States. See also 48 U. S. C. § 1236. And the Independence Act, *supra,* 48 U. S. C. § 1236 (a) (b), also regulated the amount of "export tax" which might be levied by the Philippines on articles shipped to the United States from the Philippine Islands.[9]

The Independence Act, while it did not render the Philippines foreign territory, *Cincinnati Soap Co.* v. *United States, supra,* 318–320, treats the Philippines as a foreign country for certain purposes. In 48 U. S. C. § 1238 (a) (1), it established immigration quotas for Filipinos coming to the United States, as if the Philippines were a separate country, and in that connection extended to Filipinos the immigration laws relating to the exclusion or expulsion of aliens. It also provided, 48 U. S. C. § 1238 (a) (2), that citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens. For purposes of 8 U. S. C. §§ 154 and 156, relating to deportation, the Philippine Islands are declared to be a foreign country. 48 U. S. C. § 1238 (a) (4). Foreign

---

[9] This Court has referred to goods brought here from the Philippines as "imports." See *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 320.

service officers of the United States may be assigned to the Philippines, and are to be considered as stationed in a foreign country. 48 U. S. C. § 1238a. And the Independence Act, § 6, 48 Stat. 456, 460, provides that "when used in this section in a geographical sense, the term 'United States' includes all Territories and possessions of the United States, except the Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam." As we have said, the Philippines have frequently dealt with other countries as a sovereignty distinct from the United States.

The United States acquired the Philippines by cession without obligation to admit them to statehood or incorporate them in the Union of states or to make them a part of the United States, as distinguished from merely belonging to it. As we have seen, they are not a part of the United States in the sense that they are subject to and enjoy the benefits or protection of the Constitution, as do the states which are united by and under it. In particular, the constitutional provisions governing imports and exports and their taxation, do not extend to articles brought into or out of the Philippines. The several acts of Congress providing for the government of the Philippines have not altered their status in these respects, and Congressional legislation governing trade relations of the United States with the Philippines has not only been consistent with that status, but has often treated articles brought from the Philippines to the United States as imports. Our tariff laws in their practical operation have in general placed merchandise brought from the Philippines into the United States in the same relationship to the constitutional taxing power of the national government and the states as articles brought here from foreign countries.

The national concern in protecting national commercial relations, by exempting imports from state taxation, would seem not to be essentially different or less in the

case of merchandise brought from the Philippines, which are not included in the territory organized under the Constitution, but for which we have assumed a national responsibility, than in the case of articles originating on the high seas or in foreign countries. As we have said, the reasons for protecting from state taxation articles thus brought into the territorial United States are the same in either case. The advantages and disadvantages, if any, which result from the tax immunity, are inherent in the import clause. But those advantages and disadvantages in the case of the Philippines are no more beyond the reach of Congress than in the case of other imports. Congress is left free by the terms of the import clause to remove the prohibition of state taxation of imports and with it the advantages or disadvantages, whatever they may be, arising from the tax immunity. Congress, through the commerce clause, possesses the same power of control of state taxation of all merchandise moving in interstate or foreign commerce. And Congress is free, as in the case of other imports, to regulate the flow of merchandise from the Philippines into the United States by the imposition of either customs duties or internal revenue taxes.

We conclude that practical as well as theoretical considerations and the structure of our constitutional system require us to hold that articles brought from the Philippines into the United States are imports, subject to the constitutional provisions relating to imports both because, as was said in *Brown* v. *Maryland,* they are brought into the United States, and because the place from whence they are brought is not a part of the United States in the constitutional sense to which the provisions with respect to imports are applicable.

*Reversed.*

Mr. Justice Reed, dissenting in part.

My disagreement with the Court is confined to that portion of the opinion which determines that the Philippine

Islands is not a part of this "country" as that word is defined in the opinion.

The practical effect of the decision is to place the products of those territories and possessions which have not been incorporated into our "country" as integral parts thereof—Puerto Rico, the Philippines, Guam, Canal Zone, and perhaps other territories or possessions—at a considerable advantage over the competing products of states of the continental United States. It enables importers, whether for manufacture or sale, from these possessions to keep on hand, tax free, quantities of non-taxable original packages of imported goods, such as clothing, embroideries, liquors, tobacco, sugars, vegetable oils and fibres. Freedom from taxation has today become an appreciable advantage. Furthermore this freedom from state taxation is gained through an interpretation of Constitutional power and therefore is beyond the reach of equalization by the states alone in all circumstances and by the Congress except by complex tariff legislation which would only reach warehoused imports from dependencies. The Congressional relief to producers of the several states of the Union, therefore, is an awkward approach, which will create irritation with the importing territories by reason of countervailing tariff increases.

These are only practical disadvantages of today's decision which should not override a Constitutional requirement; but as it does not seem to me the Constitution clearly calls for this sacrifice of markets by producers in the states, I would not construe the Constitution to put the Philippines entirely beyond the pale of the American economic union. I do not see the necessity for such a ruling and, in fact, I think the Constitution calls for precisely the opposite conclusion for the following reasons.

(1) In the consideration of the taxability by Ohio of shipments from the Philippines which have completed

their journey from the Philippines but remain intact in their original packages, the significant Constitutional provision is Article I, § 10, Clause 2, which reads as follows:

"No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress."

The Constitution contains no definition of the word "imports" and nothing appears in its history or in the decisions of this Court which indicates that the word was used otherwise in this section than in its normal meaning of a thing brought into the limits of the nation which possesses power over the external commerce which may flow into a state or states which are subject to the prohibition of the quoted Constitutional provision. Normally these imports are from foreign countries and hence there are many references to imports in legislation and decisions which indicate that the source of imports is foreign countries.[1]

Lands are either within the sovereign power of the United States or are outside and beyond that power. When conquest ripens into cession, lands lose their for-

---

[1] Products of the sea brought in as imports are a minor variation. Tariff Act of 1930, 46 Stat. 590, provides that dutiable articles are those "imported from any foreign country." The Philippines is not a foreign country under a tariff act which prohibits importation from a foreign country of goods made by convict labor. 28 Op. Atty. Gen. 422. The Philippines is not foreign country under the tariff laws. De Lima v. Bidwell, 182 U. S. 1, 197; Fourteen Diamond Rings v. United States, 183 U. S. 176; Dooley v. United States, 182 U. S. 222, 234; Dooley v. United States, 183 U. S. 151; American Steel & Wire Co. v. Speed, 192 U. S. 500, 520.

eign character and become a part of the territories of the victor.[2] The United States has been content to leave its possessions with a large measure of self-government. To the Philippines it has promised full independence but the time for fulfillment of that promise has not arrived. Until that date, the United States has responsibilities toward the Philippines and has exercised power unilaterally to make further concessions to the Islands.[3] Until complete independence is reached, the citizens of the Philippines owe allegiance to the United States and every Philippine official recognizes this duty. 48 Stat. 456. The interrelation between the United States and the Philippines is for both a basis for amicable relations after complete dissolution of the existing ties.[4]

(2) This Court, however, determines that an import under Article I, § 10, Clause 2, is a commodity brought into this "country" and that the Philippines is not a part of this "country" within the meaning which the Court attributes to that word. The Court is of the view that this "country" includes only those sections of the lands under our jurisdiction which have been so incorporated into our system by act of Congress as to be entitled to government under all provisions of the Constitution rather than by Clause 2, § 3, Article IV, regarding "Territory . . . belonging to the United States." *Downes* v.

[2] *American Insurance Co.* v. *Canter,* 1 Pet. 511, 542; *Fleming* v. *Page,* 9 How. 603, 614; *Dooley* v. *United States,* 182 U. S. 222, 223.

[3] Philippine Independence Act of March 24, 1934, 48 Stat. 456; amending the Philippine Independence Act as to trade and financial relations and rights of Philippine citizens in the United States and all places subject to its jurisdiction, act of August 7, 1939, 53 Stat. 1226; suspending the export tax on Philippine products, act of December 22, 1941, 55 Stat. 852; Filipino Rehabilitation Commission Act of June 29, 1944, 58 Stat. 626.

[4] Address of President Sergio Osmena on the occasion of the Reestablishment of the Commonwealth Government in Manila, February 27, 1945.

*Bidwell,* 182 U. S. 244. As a basis for this distinction, the Court depends upon a statement in *Brown* v. *Maryland,* 12 Wheat. at 437, that a "duty on imports is a custom or a tax levied on articles brought into a country." The Court must make this argument to support its position as of course the Philippines is not a foreign country. *Cincinnati Soap Co.* v. *United States,* 301 U. S. 308, 319.

There are a number of reasons why I think that this reliance on this language of *Brown* v. *Maryland* leaves the opinion without support in its conclusion that shipments from the Philippines are imports. In the first place, in *Brown* v. *Maryland,* there was no occasion to distinguish between articles brought into the country and articles brought from foreign places. The words used are descriptive of commerce from foreign lands. Secondly, *Woodruff* v. *Parham,* 8 Wall. 123, interprets the meaning of "brought into the country" as used in *Brown* v. *Maryland* as follows, pp. 131–32:

"In the case of *Brown* v. *Maryland,* the word imports, as used in the clause now under consideration, is defined, both on the authority of the lexicons and of usage, to be articles brought into the country; and impost is there said to be a duty, custom, or tax levied on articles brought into the country. In the ordinary use of these terms at this day, no one would, for a moment, think of them as having relation to any other articles than those brought from a country foreign to the United States, and at the time the case of *Brown* v. *Maryland* was decided—namely, in 1827—it is reasonable to suppose that the general usage was the same, and that in defining imports as articles brought into the country, the Chief Justice used the word country as a synonyme for United States."

See also *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, 520. Thirdly, the writer of the opinion in *Brown* v. *Maryland* referred, p. 439, to the purpose of the prohibition against state taxation of imports as a thing de-

sirable "to preserve . . . our commercial connexions with foreign nations." The dissent referred repeatedly to foreign merchandise as did counsel in their argument. Fourthly, the suggestion that the Court's view is supported by the decisions that sea products are imports seems to me unfounded. Deep-sea products come from waters beyond the national sovereignty or jurisdiction and hence are imports under any definition. American fisheries even may require, unless American bottoms are American territory, legislation to relieve their catch of general tariff charges. *Procter & Gamble Mfg. Co. v. United States*, 19 C. C. P. A. (Customs) 415. The required conclusion, it seems to me, is that an import is an article brought from beyond the sovereignty or jurisdiction of the United States. *De Lima v. Bidwell*, 182 U. S. 1, 180.

(3) Land within the jurisdiction of the United States cannot export to the United States under § 10, Article I, any more than one state can export to or import from another state. 192 U. S. at 520. When the *Insular Cases* determined that articles from the lands Spain ceded to us were subject to tariff duties at the will of Congress, the decisions were based on the power of Congress to impose duties unequally, i e., without uniformity, despite Article I, § 8, Clause 1, of the Constitution,[5] on commodities from lands under our flag because these lands had not been incorporated by act of Congress into the Union as an integral part of the United States. *Downes v. Bidwell*, 182 U. S. 244, 298 *et seq.; Dorr v. United States*, 195 U. S. 138, 149; *Balzac v. Porto Rico*, 258 U. S. 298, 305. The question as to the meaning of imports or imported was

---

[5] Article I, § 8, Clause 1: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States; . . ."

not discussed. Whether or not the articles were imports, so long as the lands of their origin were not an integral part of the United States, the Congress could put such duties as it chose on the products. It does not follow that because the Philippines is not an integral part of the United States its shipments are imports under Article I, § 10, unless the view of the Court's opinion of today is adopted that an import is an article brought into the United States as that country is defined in the Court's opinion. The argument advanced by the Court to sustain its declaration that the articles brought from the Philippines are imports would have made shipments from the Louisiana Purchase, *Downes* v. *Bidwell*, 182 U. S. 244, 322–33; Florida, *id.* pp. 333–34, and Hawaii, *Hawaii* v. *Mankichi*, 190 U. S. 197, 219, also imports until these territories were incorporated into the United States. History refutes such a position.

We are thus left to define the word import as used in § 10, Article I, in its normal sense to accomplish the purpose of the section. It may have had several purposes. *Brown* v. *Maryland, supra,* at p. 439. Whether it was to grant the Union a source of revenue, to preserve harmony among its members or to avoid state tariffs which would affect relations with foreign governments, the purpose is not advanced by molding Philippine shipments into imports in the Constitutional sense. Revenue may be exacted by the federal government from Philippine products brought into the states and a state cannot collect a duty from such articles if they are not imports. *Downes* v. *Bidwell*, 182 U. S. 244; *Woodruff* v. *Parham*, 8 Wall. 123, 133; *Coe* v. *Errol*, 116 U. S. 517, 526. No light can come from the history of the adoption of the section. The idea of an American possession was not in being. But since the Founding Fathers were creating a commercial as well as a political entity, it seems more consonant with their purpose to define imports under the section as things

brought into the territory under the jurisdiction or sovereignty of the American government.

(4) Such a conclusion probably meant little to the Philippines. Congress has provided for their early independence. But the principle established by this decision will persist for the other lands which became American by the Treaty of Paris. The Court's opinion disclaims determination of any rights beyond the Philippines but the basis upon which the decision rests supports similar rights for all lands covered by the Treaty of Paris. Similar articles covered all the ceded lands.[6] Puerto Rico is in the same status as the Philippines. *Balzac* v. *Porto Rico,* 258 U. S. 298, 305. Today's decision thus assumes a continuing importance which justifies setting out my reasons for dissenting.

MR. JUSTICE BLACK, dissenting.

In *Brown* v. *Maryland,* 12 Wheat. 419, 442, Marshall, C. J., pointedly rejected the argument that the rule announced in that case would permit an importer "to bring in goods . . . for his own use, and thus retain much valuable property exempt from taxation."[1] Today, this Court,

---

[6] Treaty of Paris, December 10, 1898, 30 Stat. 1754:

"Article II. Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas or Ladrones.

"Article III. Spain cedes to the United States the archipelago known as the Philippine Islands, and comprehending the islands lying within the following line: . . ."

[1] Counsel for Maryland had argued that to permit state tax immunity in that case would result in granting immunity to "an importer who may bring in goods, as plate, for his own use, and thus retain much valuable property exempt from taxation." In reply to this argument, Marshall rejected the assumption that the principles then announced would grant state tax exemptions to imports that had reached their ultimate destination and were being used or held for use by the importer. "The tax," he said, "finds the article already incorporated with the mass of property by the act of the importer. He has used the

in holding that an Ohio manufacturer may escape payment of a non-discriminatory state *ad valorem* tax on goods imported from abroad and held for use in its factory, interprets Marshall's opinion in a manner which squarely conflicts with his own interpretation of the rule he announced.

It has, from the very beginning, been recognized that " . . . there must be a point of time when the prohibition [to tax] ceases, and the power of the state to tax commences"; although the task of drawing this line is so difficult that no general rule "universal in its application" can be stated, yet that line nevertheless ". . . exists, and must be marked as the cases arise." *Brown* v. *Maryland, supra,* 441. The Court did there draw an arbitrary line of demarcation marking the boundary of a state's power to tax property "imported for sale." It held that, as to property imported for sale, "while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution." *Brown* v. *Maryland, supra,* at 442. The right to sell, it was there said, was an element of the right to import, and thus a state tax imposed before, or as a condition upon, the sale, would substantially impair the right of sale granted by the government to importers. The Court reinforced its conclusion by referring to its belief that a state tax on the importer would increase the cost to the ultimate domestic purchasers, and that the effect of this would be to enable the great seaport states indirectly to levy tribute upon consumers of imported articles living in the nonseaport states, a practice which the constitutional clause here invoked was intended to prevent.[2]

privilege [i. e., of sale] he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them. The same observations apply to plate, or other furniture used by the importer." p. 443.

[2] To the same effect, see *Woodruff* v. *Parham,* 8 Wall. 123, 134–136.

While the rule announced in *Brown* v. *Maryland* has at times been severely criticized, see e. g. *License Cases*, 5 How. 504, opinion of Mr. Justice Daniel, 615–617, and has in some cases been narrowly restricted in its application,[3] it has been, and still is, the general rule of decision in this Court, as regards imports for sale from foreign countries. But neither the rule nor the reasoning in *Brown* v. *Maryland*, nor any of the cases which followed it, support the Court's holding that one who imports an article for his own use or consumption can enjoy the full benefits of ownership, and simultaneously claim an immunity from state taxation on the ground that it is still an import. The Court, in *Brown* v. *Maryland*, was in reality treating goods in the hands of an importer for sale, as though they were still in transit until the first sale had been made. This was in accord with the interpretation of the rule by Chief Justice Taney in the *License Cases*, *supra*, 575. He there said that while imported articles "are in the hands of the importer for sale . . . they may be regarded as merely *in transitu*, and on their way to the distant cities, villages and country for which they are destined, and where they are expected to be used and consumed, and for the supply of which they were in truth imported."

But the fibers here were not *in transitu* in any possible sense of the phrase. Every conceivable relationship they had once borne to the process of importation had ended. They were at rest in the petitioner's factory along with its other raw materials, having arrived at the point where they were "to be used and consumed" in current produc-

---

[3] See e. g. *May* v. *New Orleans*, 178 U. S. 496; *Burke* v. *Wells*, 208 U. S. 14; *Sonneborn Bros.* v. *Cureton*, 262 U. S. 506; *Gulf Fisheries Co.* v. *MacInerney*, 276 U. S. 124; *Baldwin* v. *Seelig*, 294 U. S. 511, 526. See also *Mexican Petroleum Corp.* v. *South Portland*, 121 Maine 128, 115 A. 900, 26 A. L. R. 965, 971–980; *Tres Ritos Ranch Co.* v. *Abbott*, 44 N. Mex. 556, 105 P. 2d 1070.

tion, and kept as a "backlog" to assure constant operation of the plant.

*Brown* v. *Maryland* and the cases which followed it stand for the rule that one who pays import duties on goods intended for sale thereby purchases the right to sell the goods, free from state taxation so long as the goods are held in the original package. Until today, none of this Court's decisions have ever held or even intimated that one who imports goods for his own use purchases from the federal government, by payment of import duties, a right to hold them free from liability for state taxes, after they have reached the end of their import journey and are being held for use in the importer's factory. Neither the "purchase-of-a-right-to-sell" argument nor any of the other reasons deemed relevant to support the "import-for-sale-original-package" doctrine call for its extension to goods imported for use.

It is clear under the doctrine of *Brown* v. *Maryland,* that after sale by an importer, imported goods are subject to state taxation. The opinion of the Court today, holding that goods held for use are immune from state taxation, results in this rather odd situation: One who imports goods himself and holds them for his own use in his factory is not liable to state taxes on such goods; but if he bought the goods from one engaged in the business of importing, he *would* be liable to taxation on the same goods. The artificiality of this tax distinction suggests grave reasons to question the soundness of the Court's interpretation of the rule. Furthermore, implicit in Marshall's opinion is a recognition of the importance of protecting goods imported for sale from discrimination in the form of taxes. The net effect of today's opinion is to accomplish just such discrimination, in favor of goods imported for use, and against goods imported for sale.

Again, state taxation of previously imported goods held for use in manufacturing does not afford the great seaport

states an opportunity to tax imports to the detriment of other states. This was one of the apprehended evils which the "import for sale" rule in *Brown* v. *Maryland* was fashioned to prevent. The most fertile imagination would be hard put to prove that it would injure or threaten any other state for Ohio to collect its non-discriminatory *ad valorem* tax on fibers held for use in that state. Certainly the Court advances no persuasive argument in this respect. On the contrary, it does appear that Ohio, as well as other states, will be injured by a constitutional interpretation which denies Ohio the right to collect the tax. Ohio is injured by the Court's new rule because it cannot apportion its tax fairly upon all who carry on business under the protection of Ohio's laws.

The rule announced by the Court also discriminates against other states. Their products held for use are subject to state taxation. Products from abroad are not. Wines offer an illustration. Wines, stocked in one's private cellar, produced from California or New York grapes, and held for future use in the original package or otherwise, are subject to state taxation. Today's rule renders a state wholly powerless to tax wines imported from abroad and held for future use side by side with taxable wines made in the United States. Thus, through constitutional interpretation, all foreign products are granted a tax subsidy at the expense of the individual states affected. If I thought the Constitution required such tax discriminations against American products, I should agree to the Court's opinion. The whole history of events leading up to the Constitution, and this Court's opinions in construing it, persuade me that no such consequence was ever contemplated by those who wrote or approved our Constitution.

A final word as to today's new constitutional doctrine. Precisely how it is to be applied the Court does not tell

us. From one part of the Court's opinion it appears that the state can never tax these fibers at all, since it seems to be said the state can never tax until they "are subjected to the manufacture for which they were imported." Another part of the opinion indicates they can be taxed when the original package is broken. Previous opinions of this Court have indicated the difficulties and defects of an original package doctrine.[4] Are these fibers to be taxed when the "reed" which covers them is removed, or must the state wait until it can prove one of the steel bands has been broken? Other questions suggest themselves in regard to wine imported for use and stored in one's private cellar for individual consumption. When, if at all, can a state tax it? Is it when the wine reaches the cellar or must the state withhold its taxing hand until the wine is "subjected to the [consumption] for which it was imported"? Or can the state tax each crate when the owner, or someone for him, removes the crate's top with a crowbar? If the wine is imported in large casks, does it become taxable when the stopper is removed from the bunghole or only when a part or all of it has been consumed? The states are entitled to have a definite answer to these practical questions.

MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY, and MR. JUSTICE RUTLEDGE join in this opinion. MR. JUSTICE DOUGLAS is of the view that, accepting the Court's ruling that these products are "imports," the rule should be applied without discrimination against the Philippines.

MR. JUSTICE MURPHY, concurring in part.

With MR. JUSTICE BLACK's view that whatever constitutional tax immunity the merchandise in question may have had was lost by virtue of its storage in petitioner's

---

[4] Note 3, supra.

warehouse pending its use in petitioner's manufacturing operations I agree. But the Court holds otherwise on that issue. We therefore are met with the further issue as to whether the fact that the merchandise was shipped from the Philippine Islands to the United States made the merchandise an import within the meaning of Article I, § 10, Clause 2 of the Constitution and therefore immune from state taxation. As to that problem I am convinced that the affirmative answer given by the CHIEF JUSTICE is the correct one and I concur in that portion of his opinion.

That affirmative answer, in my estimation, is compelled in good measure by practical considerations. The moral and legal obligations owed the Philippine Islands by the United States are, so far as I am aware, matchless and unique. The United States is committed to a policy of granting complete independence to the Philippines. It has already granted their people and their officials a large measure of autonomy. But until the sovereignty of the United States is finally withdrawn, the United States retains plenary and unrestricted powers over them and is responsible for their welfare.

We have as a nation exhibited an ideal and a selfless concern for the well-being of the Philippine people, a concern that has been deepened by the devastation that war has brought to their land. Since the Islands were ceded to us, we have at once fostered their economic development through preferential trade agreements and encouraged their desires for freedom and independence. Their industries and their agriculture have gradually been adjusted in contemplation of their eventual sovereign independence. But war has stricken their land and their peoples. Their growing economy has been largely decimated by over three years of ruthless invasion and occupation. Filipinos in countless numbers have yielded up

not only their property but their lives and their liberties. Their economic and social structure has fallen about them in ruins.

Now, with the Islands liberated, our moral and legal obligations are greater than ever before. Our responsibility for providing urgent relief and rehabilitation has been readily assumed. But the more complex and difficult duty of helping to reconstruct the Philippine economic structure remains to be fulfilled. It is clear that the Philippines cannot safely be thrown into the world market and left to shift for themselves. For the foreseeable future, at least, their economy must be closely linked to that of the United States, without either country abandoning or retreating from the common ideal of independence for the Philippines.

Accordingly it is my view that if it is reasonably possible to do so we should avoid a construction of the term "imports," as used in Article I, § 10, Clause 2 of the Constitution, that would place Philippine products at a disadvantage on the American market to the advantage of products from other countries or that might be a means of impeding the economic rehabilitation of the Philippines. If we can justifiably construe that term to prohibit state taxation on shipments from the Philippines we shall to that extent have conformed to the national policy of aiding the Philippine reconstruction. Any taxation or tariff on Philippine shipments that may be felt to be necessary from the standpoint of the United States would then become a matter solely for Congress, which could properly balance any conflicting interests of the two nations.

Such a construction, in my estimation, is entirely fair and reasonable. There are, to be sure, statements by this Court to the effect that the term "imports" refers only to those goods brought in from a country foreign to the United States. *Woodruff* v. *Parham,* 8 Wall. 123, 136;

694

■■■■■■■■■■■■■■■■■■■■■■■■

*Dooley* v. *United States,* 183 U. S. 151, 154. But such statements, as pointed out by the Court today, were unnecessary to the decision of the issues there involved and cannot control the problem presented here. It has also been held that the Philippine Islands are not a foreign country within the meaning of tariff laws specifically referring to any "foreign country." *Fourteen Diamond Rings* v. *United States,* 183 U. S. 176; *De Lima* v. *Bidwell,* 182 U. S. 1. The inapplicability of these cases is obvious.

It further appears that Congress has usually avoided the use of the term "imports" in the enactment of legislation affecting trade with the Philippines and other dependencies and that the term has been regarded by certain government agencies as inapplicable to articles coming from the Philippines. But such usage clearly cannot affect our interpretation of a constitutional provision.

As appears more fully in the Court's opinion, there is thus no controlling authority requiring us to hold that shipments from the Philippines are not imports within the meaning of Article I, § 10, Clause 2 of the Constitution. Under such circumstances the interpretation of this constitutional provision adopted by the CHIEF JUSTICE is a permissible one. And, in view of what I conceive to be the practical considerations, it is a highly necessary and desirable one. Only under that interpretation can this part of the Constitution be consistent with our duties as trustee for the Philippines.