Turner, J.,
 

 dissenting. I recognize fully the duty of this court to follow the decisions of the Supreme Court of the United States in cases arising under the Constitution and laws of the United States so far as legal principles are there declared. But, where a decision of that court was based on or greatly influenced
 
 *365
 
 by the particular factual situation, I do not feel bound in a later factual situation which I do not think to be identical, even though such identity be admitted by the Attorney General. Notwithstanding the admission of the Attorney General this case has been submitted to this court and we are called upon to exercise our revisory jurisdiction over the proceedings of a duly constituted administrative agency of the state.
 

 I acquiesce in the ruling of the case of
 
 Hooven & Allison Co.
 
 v.
 
 Evatt, Tax Commr.,
 
 — U. S., — ,. 89 L. Ed., 852, 65 S. Ct., 870, though I personally believe that the following language of Mr. Justice Black in his dissenting opinion in that case is beyond debate:
 

 “Today, this court, in holding that an Ohio manufacturer may escape payment of a non-discriminatory state
 
 ad valorem
 
 tax on goods imported from abroad and held for use in its factory, interprets Marshall’s opinion in a manner which squarely conflicts with his own interpretation of the rule he announced.”
 

 I also agree with what Mr. Justice Black further said in respect of “A final word as to today’s new constitutional doctrine.”
 

 I acquiesce even though I still believe the Constitution of the United States to be a delegation of power and that the Tenth Amendment to that Constitution is still in effect.
 

 I acquiesce even though to find a majority support for the
 
 Hooven & Allison
 
 decision, resort must be had to fractions. Mr. Justice Reed dissented in part and Mr. Justice Murphy concurred in part in respect of the majority opinion, each taking different views as to the merchandise shipped from the Philippine Islands to the United States. Messrs. Justices Douglas and Rutledge joined with Mr. Justice Black as did Mr. Justice Murphy with the exception of the Philippine question. The report shows that “Mr. Justice Douglas is of the view that, accepting the court’s ruling that
 
 *366
 
 these products. are ‘ imports, ’ the rule should be applied without discrimination against the Philippines.” Hence, there were five justices who disagreed in whole or in part from what is to be accepted as the majority opinion.
 

 Mr. Chief Justice Stone’s opinion was based upon a re-examination of the facts through which he arrived at a conclusion of fact different from that of this court. Much of the majority opinion and of the partial dissent of Mr. Justice Reed and of the partial concurrence of Mr. Justice Murphy were devoted to a consideration of the merchandise shipped from the Philippines.
 

 None of the merchandise in the instant.ease came from the Philippines, so that question is not involved here.
 

 In the
 
 Hooven & Allison case
 
 that company introduced written contract forms rather than the actual contracts. Some of the testimony of brokers, by way of letters not under oath, not written in the usual course of business but solely for that case (and introduced by agreement), as well as the sworn testimony of the company’s general manager, contradicted the terms of those contract forms. A construction of the transactions at variance with the written forms of the contracts was not accepted by the Board of Tax Appeals or this court. It was represented that the merchandise involved in that case was purchased under such contract forms. Perhaps we ought to have discussed the parol evidence rule.
 

 The informality of those letters is shown by the following statement of counsel for the Hooven & Allison Company:
 

 "Now at first we thought that we could make some summary statement of these replies without setting forth the exact questions which were submitted, but the way the replies came in it is difficult to set opposite each question the precise answer that was made
 
 *367
 
 to it; so, after consultation, we thought it the better procedure to put in the questions as they were asked and then put in the replies as they were received.” There was, of course, no cross-examination.
 

 In the instant case photostats of the actual contracts were introduced. The contract terms are not contradicted and there is no occasion in the instant case for considering the parol evidence rule. So as not to take up too much space we shall copy the faces of but three of the original contracts being appellant’s exhibits 1, 2 and
 
 S'.
 

 “Castle & Overton, Inc.
 

 630- Fifth Avenue Rockefeller Center New York
 

 “Wood Pulp Contract
 

 ‘ ‘ (Conditions printed on the reverse hereof approved by the American Paper
 
 &
 
 Pulp Association, The Association of American Wood Pulp Importers, and the Swedish, Finnish, Norwegian and German cellulose and wood pulp associations.)
 

 “(K-489-B)
 

 “ Contract No. K-521 (K-490-A) New York, N. Y.,
 

 December 1st, 1938
 

 “ (Name of buyer)
 

 ‘ ‘ The Gardner-Richardson Company,
 

 “(Address) Lockland, Ohio.
 

 “We have this day sold to you for account and on behalf of O/Y Waldhof A/B, Kexholm, Finland on the terms and conditions stated below and printed on the reverse hereof, which are hereby agreed to by seller and buyer as part of this contract, the following:
 

 “Quantity and description: The quantity specified is subject to a variation not exceeding five' per cent (5%) more or less.
 

 “One thousand (1,000) tons of Kexholm laN unbleached sulphite pulp
 

 
 *368
 
 “Modo and place of delivery: f. o. b. cars Toledo, Ohio
 

 ‘ ‘ Time of shipment: From dock in the approximately following amounts:
 

 “December, 1938 — 300 tons
 

 “January, 1939 — 400 tons
 

 “February, 1939 — 300 tons.
 

 “Price: Forty dollars ($40) per ton of 2,000 lbs., air dry weight, f. o. b. cars Toledo, Ohio.
 

 “Terms of payment: Net thirty days from date of invoice, payable in New York funds. All payments to be made to Castle
 
 &
 
 Overton, Inc. Interest
 
 at 6%
 
 per annum pay-payable on overdue accounts.
 

 “Special condition of seller: Each invoice under this contract shall be supported by weight and test notes furnished by the mill. In case of dispute as to air dry content, samples for test shall be drawn from bales in good condition, the numbers of which are plainly distinguishable and the comparative test of the buyer and seller on such bales shall be the basis of settlement.
 

 “Remarks: In consideration of this order the price on 1,000 tons of Kexhólm IaN unbleached sulphite pulp covered by contract K-460 of May 3, 1938 has been reduced to $40 per ton of 2,000 lbs. air dry weight on dock Baltimore.
 

 “Accepted:
 

 ‘ ‘ The Gardner-Richardson
 

 Company Castle & Overton, Inc.
 

 “By W. S. LaRue, Buyer Carl B. Overton
 

 Vice Pres. Vice President.
 

 “BJS :HB”
 

 “Castle & Overton, Inc.
 

 630 Fifth Avenue Rockefeller Center New York
 

 “Wood Pulp Contract
 

 “(Conditions printed on the reverse hereof ap
 
 *369
 
 proved by the American Paper & Pulp Association, The Association of American Wood Pulp Importers, and the Swedish, Finnish, Norwegian and German cellulose and wood pulp associations.)
 

 “Contract No. W-640 New York, N. Y.,
 

 October 6th, 1938
 

 “(Name of buyer)
 

 “The Gardner-Richardson Company,
 

 “(Address) Loekland, Ohio.
 

 “We have this day sold to you for account and on behalf of Zellstofffabrik-Waldhof Berlin W 8, Germany on the terms and conditions stated below and printed on the reverse hereof, which are hereby agreed to by seller and buyer as part of this contract, the following:
 

 “Quantity and description: The quantity specified is subject to a variation not exceeding five per cent (5%) more or less.
 

 “Six hundred (600) tons prime bleached aspen sulphite pulp
 

 “Mode and place of delivery: On dock Baltimore
 

 “Time of shipment: From abroad December 1938 through May 1939. In approximately equal monthly quantities
 

 “Price: Two dollars and fifty cents ($2.50) per 100 lbs., air dry weight on dock Baltimore freight allowed to Loekland or Middletown, Ohio
 

 “Terms of payment: Net thirty days from date of invoice, payable in New York funds. All payments to be made to Castle
 
 &
 
 Overton, Inc. Interest at 6% per annum pay-payable on overdue accounts.
 

 “Special condition of seller: Each invoice under this contract shall be supported by weight and test notes furnished by the mill. In case of dispute as to air dry content, samples for test shall be drawn from bales in good condition, the numbers of which are plainly distinguishable and the comparative test of the buyer and
 
 *370
 
 seller on such bales shall be the basis of settlement.
 

 “Remarks: As per contract W 641 — -last 400 tons to be billed at $45 on dock Balt. As per letter 9/15/39— last 130 tons replaced by 100 tons Champion Aspen at $49 del.
 

 “Accepted:
 

 ‘ ‘ The Gardner-Richardson
 

 Company Castle
 
 &
 
 Overton, Inc.
 

 “By W. S. LaRue, Buyer Carl B. Overton
 

 Vice Pres. Vice President.
 

 “CBO :HB”
 

 “Castle & Overton, Inc.
 

 630 Fifth Avenue Rockefeller Center New York
 

 “Wood Pulp Contract
 

 “(Conditions printed on the reverse hereof approved by the American Paper & Pulp Association, The Association of American Wood Pulp Importers, and the Swedish, Finnish, Norwegian and German cellulose and wood pulp associations.)
 

 ‘ ‘ Contract No. W-575 New York, N. Y.,
 

 March 27th, 1936
 

 “ (Name of buyer)'
 

 “The Gardner-Richardson Co.,
 

 “(Address) Lockland, Ohio.
 

 “We have this day sold to you for account and on behalf of Zellstofifabrik-Waldhof Berlin, Germany on the terms and conditions stated below and printed on the reverse hereof, which are hereby agreed to by seller and buyer as part of this contract, the following:
 

 “Quantity and description: The quantity specified is subject to a variation not exceeding five per cent
 
 (5%)
 
 more or less.
 

 “Eighteen hundred (1,800) tons of Waldhof aspen bleached sulphite pulp
 

 
 *371
 
 “Mode and place of delivery: On dock Atlantic ports
 

 “Time of shipment: From abroad in approximately equal monthly quantities over 1937
 

 “Price: Two dollars and fifty cents ($2.50) per hundred lbs., air dry weight on dock Atlantic ports
 

 “Terms of payment: Net thirty days from date of invoice, payable in New York funds. All payments to be made to Castle & Overton, Inc. Interest at
 
 6%
 
 per annum pay-payable on overdue accounts.
 

 “Special condition of seller: Each invoice under this contract shall be supported by weight and test notes furnished by the mill. In case of dispute as to air dry content, samples for test shall be drawn from bales in good condition, the numbers of which are plainly distinguishable and the comparative test of the buyer and seller oh such bales shall be the basis of settlement.
 

 “Remarks:
 

 “Accepted:
 

 “The G-arclner-Richardson
 

 Company Castle & Overton, Inc.
 

 “By W. S. LaRue, Buyer Carl B. Overton
 

 Vice Pres. Vice Pres.
 

 “CBO.-HB”
 

 After a review of the facts of the instant case I agree with the following finding of facts made by the Board of Tax Appeals in its journal entry:
 

 “The board further finds that the appellant is not ■the importer of the pulps which came from countries other than Canada as said pulps were purchased under landed contracts by which the appellant did not acquire title until said goods had been entered and delivered at points within this country. * * * In view of the finding hereinafter made, it is not necessary to determine whether appellant was the importer of the goods coming from Canada.
 

 ‘ ‘ The board further finds that even assuming appellant was the importer of all the goods herein involved
 
 *372
 
 whether coming from Canada or other countries that all of said goods had so come to rest as to be mingled with the mass of property in this country and had therefore lost their character as imports when the tax here involved was levied. * * * The records show that said pulps were stored at appellant’s warehouse at its manufacturing plants at Middletown, Ohio, and Lock-land, Ohio, and remained in said warehouse in the original packages, which packages were not broken until the pulps were needed for use in appellant’s manufacturing process and that all of said pulps were purchased and held by the appellant for use in its manufacturing process and not for the purpose of sale.”
 

 The Supreme Court of the United States has not repudiated the second paragraph of our syllabus in the case of
 
 Hooven & Allison Co.
 
 v.
 
 Evatt, Tax Commr.,
 
 142 Ohio St., 235, 51 N. E. (2d), 723, which reads as follows :
 

 ‘
 
 ‘
 
 The state has the power to levy a general property tax on imported goods so long as such tax does not intercept the import in its way to become incorporated with the general mass of property or deny to the import the privilege of becoming so incorporated until it shall have contributed to the revenue of the state.”
 

 I am of the opinion that this court should affirm the decisions of the Board of Tax Appeals for the reason that the factual situation here differs from that found by the Supreme Court of the United States in the
 
 Hooven & Allison case.