RAFAEL BUSCAGLIA, TESORERO DE PUERTO RICO, peticionario *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; OCHÓA FERTILIZER CORPORATION, interventora.

Núm. 83.—*Sometido:* Junio 17, 1946. *Resuelto:* Diciembre 3, 1946.

*Hon. Procurador General Interino Luis Negrón Fernández (E. Campos del Toro, ex Procurador General,* en el alegato), y *Elmer Toro Lucchetti,* abogado éste del Departamento de Justicia, abogados todos del peticionario; *Guillermo E. González,* abogado de la interventora, querellante en el pleito principal.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Ochoa Fertilizer Corporation (a la cual llamamos Ochoa) organizó en el año 1937 una corporación subsidiaria denominada Puerto Rico Phosphate and Acid Works, Inc. (en adelante denominada P. R. Phosphate) para dedicarse a la manufactura de ácido sulfúrico y superfosfatos. La compañía creada emitió acciones comunes y libró pagarés los que pasaron a Ochoa, a cambio de las maquinarias y equipo de la planta que Ochoa había adquirido para la manufactura y elaboración de dichos productos. La P. R. Phosphate solicitó de la Comisión de Servicio Público que se eximiera del pago de contribuciones la industria nueva establecida por ella a tenor con la Ley 94 de 14 de mayo de 1936 ((1) pág. 495). Después de celebrada la vista pública correspondiente dicha exención fué concedida por la Comisión y aprobada por

el Gobernador.([1]) Posteriormente se construyeron plantas adicionales para la manufactura de ácido muriático y sulfato de potasa y a petición de la P. R. Phosphate dichas plantas (edificios, maquinarias, derechos y privilegios) también fueron declaradas en junio 5 de 1940 exentas como industria nueva del pago de contribuciones.([2]) Las exenciones concedidas excluyeron expresamente "cualquier contribución que esté impuesta o se imponga por ley sobre el producto o los productos terminados de esta industria."

En noviembre de 1942 la P. R. Phosphate solicitó de la Comisión de Servicio Público se traspasaran a Ochoa las exenciones concedidas y en diciembre 29 de dicho año dicho traspaso fué aprobado por la Comisión de Servicio Público. En 1943 quedó disuelta la corporación subsidiaria.

En 2 de septiembre de 1944 Ochoa ordenó a la P. R. Iron Works, representantes en Puerto Rico de la White Motor Co., de Estados Unidos, un *truck* tractor para ser entregado F.A.S. en Nueva York por el precio de $3,650. El truck fué entregado al barco San Luzon en Nueva York y consignado a la orden de "The White Motor Co." con notificación de avisar a su llegada a la Phosphate & Acid Works-Ochoa

---

([1])En lo pertinente, la resolución de la Comisión dictada el 29 de diciembre de 1938, dice así:

"... que *la industria* establecida por la peticionaria Puerto Rico Phosphate & Acid Works, Inc. para la manufactura y elaboración de ácido sulfúrico y superfosfatos, constituye una industria nueva en Puerto Rico, con relación a la cual dicha peticionaria tiene derecho a exención de contribuciones bajo las disposiciones de la ya mencionada Ley núm. 94 de mayo 14, 1936, y en su virtud esta Comisión de Servicio Público por la presente declara exentas de toda clase de contribuciones y derechos de licencias, patentes y arbitrios municipales, y de toda otra contribución municipal, y por el período de diez años, así como también todos los edificios, maquinarias, materiales, terrenos y en general todos los bienes, derechos y privilegios pertenecientes a la peticionaria y que sean imperiosamente necesarios para su trabajo y funcionamiento con relación a la elaboración y manufactura de los ya mencionados productos o sustancias, todo lo que determinará el Tesorero de Puerto Rico previa declaración de la peticionaria."

([2]) Esta segunda exención se concedió "por el tiempo que falta para el vencimiento de la exención" concedida en diciembre 29 de 1938.

·Fertilizer Corp. El conocimiento fué endosado a Ochoa por la P. R. Iron Works, Inc., siendo retirado el camión del muelle por Ochoa.

El Tesorero de Puerto Rico impuso sobre el truck arbitrios con penalidades e intereses ascendentes a $1,059.47 a la P. R. Iron Works los cuales fueron pagados bajo protesta por Ochoa quien entonces radicó querella contra el Tesorero ante el Tribunal de Contribuciones solicitando la devolución de la suma pagada bajo protesta. Visto el caso, el Tribunal de Contribuciones falló a favor de la querellante y para revisarlo expedimos, a solicitud del Tesorero, auto de *certiorari*. Sostiene el peticionario que el Tribunal de Contribuciones erró (a) al resolver que la exención de contribuciones concedida a la Puerto Rico Phosphate, en armonía con la Ley núm. 94 de 14 de mayo de 1936, podía ser transferida a Ochoa al traspasarse las propiedades de la primera a la segunda y quedar consolidadas las dos corporaciones, toda vez que de acuerdo con la citada Ley núm. 94 de 1936, la Comisión de Servicio Público no tiene facultad para ordenar el traspaso de una exención de contribuciones concedida por concepto de industria nueva a una planta industrial; (b) al resolver que el traspaso de la exención en el presente recurso era válido no obstante no haber sido aprobado por el Gobernador de Puerto Rico; (c) al resolver que las contribuciones por concepto de arbitrios están incluídas dentro de la exención contributiva concedida, y (d) al resolver que, si bien la importadora había sido realmente la propia embarcadora y no Ochoa, no procedía la imposición y cobro de los arbitrios sobre el camión debido a que la entidad que finalmente lo adquirió y usó en Puerto Rico, o sea, Ochoa, estaba exenta del pago de arbitrios.

■■ Tiene razón el peticionario al sostener que la regla general establecida es al efecto de que una exención contributiva no es transmisible. Esto es así, sin embargo, cuando la exención concedida es un privilegio personal y su traspaso

no ha sido autorizado por ley, pero no cuando la exención es un privilegio que se concede a la propiedad y forma parte de la misma. Cooley, en su obra *Taxation*, expone la doctrina diciendo:

"La inmunidad contributiva es unas veces un privilegio personal y otras un privilegio anexado a la propiedad como perteneciente a la misma. Si es un privilegio personal, no puede ser transferido sin expresa autorización legal. Cuando está anexado a la propiedad se traspasa con la propiedad como parte de la misma." Vol. 2, Sec. 718, pág. 1508.

El mismo autor dice que el privilegio concedido a la propiedad no pasa, "por su propia fuerza y sin dirección legislativa con la propiedad a que fué concedido." *Ob. cit.* pág. 1508. Empero, la jurisprudencia ha sostenido que cuando la intención legislativa es clara la exención es transmisible. Así en el caso de *Memphis & Little Rock Railroad Company* v. *Railroad Commissioners,* 112 U. S. 609, se resolvió, citando del sumario, que: "Un estatuto eximiendo a una corporación del pago de contribuciones confiere un privilegio únicamente a la corporación especificada, y el derecho no se transmite a su sucesora a menos que la intención del estatuto a ese efecto sea claro y expreso," diciéndose en el curso de la opinión que la regla "se basa en una obvia política pública que considera tales exenciones como una derogación de la autoridad soberana . . . y por lo tanto no debe extenderse más allá de la concesión exacta y expresa, interpretada *strictissimi juris.*"[3]

En el caso de autos se trata de una exención contributiva concedida a una industria nueva, a virtud de la Ley 94 de 14

[3] Se ha dicho que el concepto de inmunidad contributiva anexa a una propiedad es puramente metafísico ya que "La concesión es a una persona en relación con una cosa, y se dice que se adhiere a la misma sólo cuando por sus términos la concesión puede traspasarse con la cosa y pasa como un incidente con el título a cada dueño sucesivo. Tiene que haber siempre una persona (natural o jurídica) capacitada no sólo para recibir título sino también de aceptar las condiciones que lo acompañan y que constituyen la exención; de lo contrario las condiciones llegan a ser imposible y nulas." *Louisville & Nashville R. R. Co.* v. *Palmes,* 109 U. S. 244, 255.

de mayo. de 1936. La ley en su artículo 3 dispone que: "Las industrias nuevas a quienes se conceda exención de contribuciones, sus *edificios, maquinarias, materiales y en general todos los bienes, derechos y privilegios pertenecientes a dichas industrias,* que sean imperiosamente necesarios para su trabajo y funcionamiento, estarán exentas de contribuciones por el período de tiempo que fijare la Comisión de Servicio Público de Puerto Rico . . ." (Bastardillas nuestras.) Dicha exención, de acuerdo con el artículo primero de la ley, se hace "con el propósito de proteger y estimular el nacimiento de las mismas." A nuestro juicio el legislador expresó claramente su intención al efecto de que la Comisión de Servicio Público puede conceder en estos casos no una exención como privilegio a la persona, bien sea natural o jurídica, que por primera vez establece una industria en Puerto Rico, sino a la industria nueva con todas sus propiedades necesarias para el desarrollo de la misma y excluyendo únicamente las contribuciones sobre el producto terminado. El fin es estimular en Puerto Rico no sólo que se establezcan nuevas industrias tan necesarias para la economía del país sino proteger su desarrollo.

En el caso de *Robertson* v. *Mississippi Packing Co.,* 98 So. 539, 540, en el cual los hechos eran parecidos al de autos y el que se resolvió a base de un estatuto similar al nuestro [4] la corte concluyó que la exención era transmisible. Los hechos envueltos en este caso eran los siguientes: La Natchez Packing Company, organizada en 1910, construyó en 1911 una planta con el fin de enlatar carnes y consiguió la exención contributiva y comenzó a trabajar. Al año y meses después fué hipotecada la planta y posteriormente la compañía fué declarada insolvente y ejecutada la hipoteca. La Mississippi Packing Co. adquirió en 1914 la planta del acreedor hipote-

---

[4] La ley disponía que entre otras empresas aquellas plantas que se dedicaran a la industria de enlatar carnes "que estuvieran siendo establecidas o que se establecieran en el futuro por el Estado . . . estarán exentas de toda contribución del Estado, condado, y *levee* por un término de cinco años."

cario y la rehabilitó para comenzar de nuevo a enlatar carnes. Solicitó una exención contributiva por otros cinco años. La corte de Mississippi sostuvo que si bien la compañía no tenía derecho a solicitar una nueva exención, sin embargo lo tenía a continuar exenta por el resto del tiempo, hasta los cinco años, que faltaba para expirar la exención concedida a la firma que obtuvo la exención originalmente. En otras palabras, que los tres años y medio de exención que la anterior compañía no había aprovechado se transmitían con la propiedad a la nueva compañía. La corte usó el siguiente razonamiento: ''La Legislatura tuvo en mente, al aprobar este estatuto, no a los accionistas o dueños de la empresa, ni a los oficiales y empleados que operaban la misma. El pensamiento controlador fué estimular el establecimiento en este estado de cierta clase de manufacturas y otras empresas. Con el fin de inducir a su establecimiento, se les concedió una exención de contribuciones por cinco años. Esa fué la consideración ofrecida por el estado para el beneficio público que estaba supuesto a fluir del establecimiento y operación de dichas empresas.

'' * * * * * * * *

''La Natchez Packing Company tenía derecho a la exención desde la fecha de sus cláusulas de incorporación, 21 de febrero de 1910, por un período de cinco años, que por tanto, terminaba en febrero 21 de 1915, y el apelado, como dueño de esa planta, tiene derecho al beneficio de esa exención hasta esta última fecha.''

Esta misma doctrina fué ratificada en el caso de *Gully* v. *Wilmut Gas & Oil Co.*, 165 So. 620. Allí se dijo, y citamos del sumario: ''Cuando una corporación tiene derecho a estar exenta del pago de contribuciones por ser una empresa nueva de utilidad pública, el comprador de la *propiedad* de esa corporación, vendida en ejecución de hipoteca, tiene derecho a una exención similar por el balance del período de cinco años de exención.'' (Bastardillas nuestras.)

En el caso de *P. R. American Sugar Refinery, Inc.* v. *Tesorero,* 46 D.P.R. 602, citado por el Tribunal de Contribuciones, se asumió, sin resolverlo, que ciertos bienes, que gozaban de exención contributiva, traspasados por la Sucesión de J. Serrallés a una corporación subsidiaria suya, continuaban exentos. Es cierto que la exención fué concedida bajo la Ley núm. 92 de 1917 (apéndice, pág. 15), según fué enmendada por las Leyes núms. 16 de 1925 (pág. 133), 10 de 1927 (pág. 431) y 40 de 1930 (pág. 315), pero aquella ley, al igual que la presente, guardaba silencio en cuanto a si eran transmisibles las exenciones contributivas y sólo disponía que las exenciones a industrias nuevas serían aprobadas por la Comisión de Servicio Público.

Somos de opinión que bajo los términos de la ley en vigor la exención concedida a los bienes de la P. R. Phosphate podía ser traspasada a la Ochoa y que el tribunal inferior no cometió el primer error señalado.

▆▆▆ Sostiene el apelante en su segundo señalamiento que la Comisión de Servicio Público no podía aprobar el traspaso de la exención contributiva sin que, a su vez, el Gobernador la aprobara. La Ley núm. 94 de 14 de mayo de 1936 guarda silencio en cuanto a este extremo. En su artículo tercero, que es donde habla de la aprobación por el Gobernador a las exenciones concedidas por la Comisión, nada dice en cuanto a los traspasos. La Ley núm. 70 de 1917 ((2) pág. 433), que es la que prescribe y define las facultades y deberes de la Comisión de Servicio Público, en su artículo 58 establece: "Las franquicias, derechos, privilegios y concesiones que se otorgaren por la mencionada Comisión no tendrán efecto hasta que fueren aprobadas por el Gobernador, y serán informadas al Congreso." No hay duda de que al aprobarse la Ley núm. 94 de 1936 la Legislatura tuvo presente esta disposición que no es otra cosa que un cumplimiento con lo ordenado en el artículo 38 de la Carta Orgánica, y así lo hizo constar. Sin embargo, ¿existía algún precepto estatu-

tario que requiriera la aprobación del Gobernador del traspaso de un privilegio o concesión como lo es una exención de contribuciones? Opinamos que no. La Ley 70 de 1917, en su artículo 55 así lo establece al decir: "Ninguna venta, *traspaso,* compra, *adquisición,* aceptación o tenencia, ya sea en absoluto dominio o en pignoración directa o indirecta de cualesquiera franquicias, derechos, *privilegios* o *concesiones,* otorgada para usos públicos o cuasi-públicos, *tendrá efecto hasta que fuere aprobado por la Comisión."* (Bastardillas nuestras.) No se menciona para nada al Gobernador en los casos de traspasos de privilegios o concesiones y opinamos que es suficiente la aprobación del traspaso hecho en este caso por la Comisión de Servicio Público para que éste sea válido.

■■ En cuanto al tercer error señalado, es cierto, como arguye el Tesorero, que una exención de contribuciones por lo general no se extiende a arbitrios, pero también lo es el hecho de que "esta regla no es absoluta y depende de las circunstancias de cada caso en particular." *State ex rel. Missouri Portland Cement Co.* v. *Smith, Auditor,* 90 S. W.2d 405, 407. En el caso de autos el propio lenguaje de la ley justifica incluir los arbitrios entre las contribuciones de las cuales está exenta la apelada. Veamos por qué:

La ley establece expresamente que no estarán incluídas en la exención que se concede a industrias nuevas ni la contribución sobre ingresos ni la cuota correspondiente a indemnizaciones a obreros. Pudo el legislador excluir en igual forma los arbitrios y el hecho de no haberlo hecho puede interpretarse que fué su intención que estuvieran incluídos en la exención. Refuerza esta conclusión el hecho de que en la sección cuatro de la ley se establece "que el municipio en el cual radique dicha nueva industria vendrá obligado a reconocer tal exención; y, en su consecuencia, estará impedido de cobrar a dicha nueva industria licencias, patentes, *arbitrios municipales* o cualquier otra contribución

municipal, . . .''. (Bastardillas nuestras.) Al prohibir la Legislatura a los municipios cobrar sus arbitrios es un indicio fuerte de que consideraba a la nueva industria exenta de pagar los insulares, al disponer que las únicas contribuciones que no estaban incluídas en la excención eran la contribución sobre ingresos y las cuotas correspondientes a la Ley de Indemnizaciones a Obreros.

. Otro factor que indica que ésa fué la intención legislativa es la sección sexta de la ley que dispone que: ''La concesión del privilegio de exención de contribucines, según por esta ley se determina, *no afectará el pago de los arbitrios sobre bebidas alcohólicas* cuando la nueva industria a quien se otorgue tal exención sea una dedicada a la manufactura de bebidas alcohólicas. En este caso los dueños de la industria vendrán obligados al pago de los arbitrios antes mencionados, *a pesar de la exención concedídales.''* (Bastardillas nuestras.)

El hacer el legislador una excepción en relación con un arbitrio en particular, tiende a demostrar que todos los demás arbitrios están incluídos en la excención conributiva. Expresó su intención de que el arbitrio sobre bebidas alcohólicas fuera pagado y no los demás.

El caso de *E. Solé & Cía.* v. *Sancho Bonet, Tes.,* 53 D.P.R. 762, citado por el peticionario, no es aplicable a los hechos del de autos y es fácilmente distinguible. En aquél se resolvió que la exención concedida a la demandante sólo incluía la industria de fabricación de *chassis* de automóviles y habiendo la prueba demostrado que ella no se dedicaba a dicha fabricación .el Tesorero podía cobrarle el arbitrio correspondiente a ciertos chassis importados, resolviéndose, además, que en todo caso, no procedía el remedio de *injunction* para impedir el cobro de dichos arbitrios sino que la demandante debió haber pagado los mismos bajo protesta y haber reclamado su devolución y en dicho pleito haber planteado la cuestión de la supuesta exención.

■ En cuanto al último señalamiento de error, si bien es cierto que el tribunal inferior resolvió que' la importadora del camión fué la propia embarcadora, la White Motor Company, al mismo tiempo resolvió que "la entidad que finalmente lo adquirió y usó en Puerto Rico lo fué una que estaba exenta del pago de arbitrios." Como hemos dicho antes el camión fué entregado al vapor San Luzon en Nueva York y consignado a la orden de la White Motor Company con notificación de avisar a su llegada a Puerto Rico a la Phosphate & Acid Works-Ochoa Fertilizer Corporation y el conocimiento fué efectivamente endosado a Ochoa por la P. R. Iron Works, Inc. siendo retirado el camión del muelle por Ochoa. Estos hechos fueron alegados y probados por la peticionaria. Bajo nuestra decisión en *West India Oil Co.* v. *Tribunal Contribuciones,* 65 D.P.R. 76, la conclusión a que llegó el tribunal inferior es correcta.

En el caso de *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, los hechos demostraron que la peticionaria recibió del extranjero ciertas fibras con las cuales fabricaba cables y sogas. Dichas fibras venían consignadas a la orden del agente del productor en Estados Unidos con aviso de "Notificar a la Hooven & Allison Co." Bajo estos hechos la Corte Suprema Nacional resolvió, a la página 664, que: "Es suficiente, para los fines presentes, que la mercancía en este caso fué importada; y que el peticionario fué la causa eficiente de su importación, el propósito y efecto de la cual era la adquisición de la mercancía por la peticionaria para manufacturarla en productos terminados. Concluimos que la peticionaria fué la importadora, y que la mercancía en sus manos tenía derecho a la inmunidad contributiva constitucional, la cual sobrevivió la entrega aquí de las importaciones."

En el caso de autos, habiendo sido Ochoa la causa de que el camión se importara para ella dedicarlo a la industria que estaba exenta es ella la importadora de acuerdo con la doctrina expuesta.

*Debe anularse el auto expedido y confirmarse la resolución recurrida.*

El Juez Asociado Sr. Snyder, aun cuando ausente en los Estados Unidos, está conforme con el resultado.